(No. 6924. December 6, 1941)

A. A. DURAND and PAUL DURAND, a co-partnership, doing business under the firm name and style of A. A. DURAND & SON, Appellants, v. M. K. CLINE, Treasurer of the City of Moscow, Idaho, and HENRY C. RACH, R. B. WARD, T. F. HOFFMAN, ALBERT RAMSTEDT and WALTER SCHUMACHER (Intervenors) Respondents.

(119 Pac. (2d) 891)

Durham & Hyatt, for Appellants.

Weldon Schimke, for Respondents.

GIVENS, J.—The council of the city of Moscow by ordinance called an election on the proposal to issue $65,-000 in bonds "for the purpose of improving the water-works system of the City of Moscow and building a water storage tank," "to provide a more adequate water supply for the city and better fire protection," "said contemplated improvements consist principally of the erection of an

elevated water storage tank of approximately 500,000 gallons capacity, together with any and all mains, valves, gates, connections and fixtures necessary to connect said tank with the present water system of the City of Moscow, together with the improvements or extension of certain water mains." The people voted the bonds, which were issued and sold. Whereupon, by contract with the city, appellant agreed to drill a well for $1 per inch in diameter per foot depth. Appellant drilled to a depth of 800 feet, no adequate supply of water being then obtained. The city in partial payment on such contract issued its warrant for $1,000. The city treasurer refused payment. Appellant sued for a writ of mandate in the district court to compel payment of the warrant. Certain taxpayers intervened, aligning themselves with respondent. Upon a stipulation of facts, the court quashed the alternative writ and dismissed the action, hence this appeal.

In oral argument, while adverting to the fact that such plans and specifications as the city engineer had submitted to the council did not, as shown by the stipulation of facts, mention or describe any well, we understood counsel for respondent to not now stress that such plans were so deficient under 49-332 I. C. A. as to bar respondent from recovery herein, and said statute is not cited or referred to in respondent's brief, hence it is unnecessary to consider such feature further, because neither article 8, section 3, of the constitution, or any of the bond statutes (49-2402-3, 49-2411, 55-203, 55-220) require as a prerequisite to or concomitant part of the election, plans or specifications. The bond issue is one thing; the contracts to carry out the purpose of the bond issue are another. There is herein no question of the legality of the bonds.

Respondent agrees with appellant that there are but two questions, the first of which is decisive because of our conclusion thereon: "Did the city have authority to expend a part of the money derived from the sale of the bonds in improving the water system by drilling the well in question?"

Respondents' contentions challenging the validity of the contract are that the terms of the ordinance calling for the

election on the bond issue did not mention or refer to a well and did not generally contemplate or give notice that a well was to be part of the improvements in connection with the enlargement of the waterworks and that no plans and specifications mentioned a well, and that only a dry hole has been drilled, which is not an improvement.

Before water may be stored, it must be obtained; hence, the building of storage facilities, tanks or reservoirs, would necessarily presuppose and contemplate acquiring by some means and from some source water to place therein. The stipulation shows that prior to the present controversy and the contemplated improvements Moscow secured its supply of water from wells, stored in aerial tanks. If enough water was already available from the existing wells to fill the contemplated tank as well as those already constructed, no new water supply need be obtained and vice versa.

The contention that because the well is thus far dry it is not an improvement, hence not within the purview of the bond issue, is premature. Respondents interfered with the drilling of the well, appellant being ready, willing, and able to continue, and the city being agreeable thereto; and what may ultimately, within reasonable limits, be obtained by continued drilling is the criteria. At this time we are not called upon to fix such limits. One might as well say a tank without water to fill it is no improvement, hence could not be built. Sound judgment would clearly seem to dictate that a flowing well had best be drilled before erecting a container therefor. An empty tank and water mains with no supply of water to fill them would seem as void of benefit to a municipality as an empty or dry well. Respondents urge the appellants are interested in the delivery of water; true, but there can be no delivery of water without water to deliver. Pursuing such metaphysical legerdemain pro or con would be as devoid of result herein as the dry well and as fruitless as a disquisition upon the age-old query as to which came first, the chicken or the egg.

The first case bearing on the sufficiency and scope of an ordinance of intention in connection with a bond issue

for municipal waterworks and work done thereunder and sufficiently in point to be closely analogous is *Corker v. Village of Mountain Home*, 20 Ida. 32, 116 Pac. 108, wherein, speaking through Justice Ailshie, the court said:

"The next objection is 'that bonds for the construction of a waterworks system have been included in a notice for bonds for the purchase of water rights for power purposes without specifying the amount to be devoted for the construction of a waterworks system or purchase of water rights.' This objection is answered by what we have said with reference to the first question presented. It would doubtless have been impossible for the village authorities to designate the amount of money they would be obliged to expend in procuring water rights, or the particular amount that it would be necessary to expend for power purposes or that which would be expended directly and primarily in the construction of the waterworks.' On the other hand, it will be the duty of the village authorities to expend such sum as may be necessary and essential for each of these incidental and subsidiary necessities in order to accomplish the main purpose.

It is lastly contended by the appellant 'that the notice of election fails to correctly or legally state the purpose for which the election was called, and in fact states a purpose unknown and foreign to the purpose declared in said ordinance.' In cases of this kind, it is not necessary that the purpose for which the election is to be held and the bond issue is to be authorized should be stated in any exact form or specific language; but the test of the sufficiency or validity of a notice or ordinance in this respect is, whether the voters at the general election held pursuant to the ordinance and notice can be reasonably presumed from the notice itself and the ordinance to have understood the question submitted to them. There can be no reasonable doubt in this case but that the electors of Mountainhome knew and understood perfectly well that the purpose of this election was to determine whether or not the qualified voters would authorize the village authorities to issue the coupon bonds of the village of Mountainhome for the sum of $35,000, in order to construct and install a waterworks system for the use of the

inhabitants of that village, and that this purpose included all the necessary and incidental means that might be covered by or included in the main object to be attained, namely, a sufficient supply of water for the use of the village and the inhabitants thereof [citing authorities]."

Passing upon the scope of the description of work to be done in connection with paving, the court said in *McEwen v. City of Coeur d'Alene,* 23 Ida. 746, 132 Pac. 308:

"It will be observed from said ordinance that the character of improvement is designated as 'suitable pavements,' a concrete curb and a drainage or sewer system. It will be seen that the description does not specify the name or kind of pavement, except that such shall be suitable, and the curbing is not described as to its size or extent or the materials to be used, neither are the tile and pipe drains in any way specified by name or description or material, and the same is true as to the drainage sewer and the catch basins.

\*    \*    \*    \*    \*    \*    \*    \*    \*

"It is provided (in par. 4, subd. 6 of sec. 2238) : 'The city council or trustees shall, before or during the grading, paving or other improvement of any street or alley . . . . pass at a regular or special meeting a resolution or ordinance declaring its intention to make such improvement, and stating in such resolution or ordinance . . . . the general character of the proposed improvement. . . . '

\*    \*    \*    \*    \*    \*    \*    \*    \*

"There is no ambiguity in the language of the statute; it is plain, and no technical rules are required in order to interpret the intention of the legislature. The language used is general, and this court is not inclined to restrict the meaning or interpret in the statute requirements which were not intended by the legislative authority. If the legislature intended that the city council in such resolution or ordinance should in detail state the name of the pavement and the material to be used and the details of the curbing and material used and the kind of sewer-pipes, etc., the legislature would have said so.

"By the use of the words 'general character,' it was not intended that a special, particular, minute or detailed description of the work to be done should be stated. 'General' means pertaining to a whole class or order; belonging to a whole rather than a part; not restrained or limited to a precise or detailed import; and character means account, description. (*Joost v. Sullivan*, 111 Cal. 286, 43 Pac. 896.) The Standard Dictionary defines 'general,' as used in subd. 4, as follows: '2. Pertaining to the majority; common to the greater number but not to all; true of a large number or proportion; wide-spread or prevalent, as distinguished from universal. 3. Large or unlimited in scope, meaning or contents; not restricted in application or jurisdiction; opposed to particular or special; hence, indefinite or vague. 4. Usual or customary; common. 5. Viewed altogether or as a whole; taken all in all; as, one's general behavior. 6. Relating to public or daily affairs; common and vulgar.' Under this definition it would seem that No. 2 specially applies to the use made of the word in subd. 4; that general does not mean a special, particular, minute or detailed description of the work to be done."

And finally in *King v. Independent School Dist.*, 46 Ida. 800, 272 Pac. 507, the court said:

"The use of the word 'purpose' in sec. 3, art. 8, of the constitution was intended in the broad and general sense of whether an indebtedness over the yearly income should be incurred by the municipality or body concerned, and, of course, for the specific but general purpose indicated; but it does not seem to us that the 'purpose' meant that a vote should be on each item of expenditure contemplated, but rather the general 'purpose' of borrowing money for the general purpose contemplated. Sec. 18, art. 11, of the California constitution (p. lxxxv, Henning's General Laws of California) is similar to sec. 3, art. 8 of the Idaho constitution, and under the California constitution, a statute joining purposes for one vote is allowed [citing authorities]."

See also *City of Alburquerque v. Water Supply Co.*, 24 N. M. 368, 174 Pac. 217.

█ The rule deducible from the decisions is that the purpose must be sufficiently definite to reasonably apprise the voters of the general nature, purpose, and scope of the improvement contemplated, but that it need not go into minute detail, and, on the other hand, of course, is not to be so general as to allow unlimited expenditures not properly connected with and necessary for the complete accomplishment of the main purpose, herein, to improve and augment the water system of the city. While the ordinance of intention stated the improvement would consist principally of the erection of a tank, it is also specifically stated it was for the purpose of improving the waterworks and providing "more adequate water supply." "More" is defined by Webster's New International Dictionary (2d Ed.) as follows: "1.a. Greater, as in size, number, power. c. Greater in degree or scope. 2. Existing in a greater quantity, amount, degree, quality, and the like. 3. Greater or exceeding in numbers. 4. Additional; other; as, no more worlds to conquer." Funk & Wagnalls New Standard Dictionary defines "more" as: "1. Greater in amount, extent or degree: as comparative of much; as, more water; more beauty. 2. Greater in number: as comparative of many; as, more apples. 4. Added to some former number; additional, extra; as, how any more are there?" "More adequate water supply" clearly comprehended water in addition to that already being furnished, that is, available from the then existing wells.

The council necessarily is clothed with a certain latitude of discretion in carrying out the improvements authorized by vote of the people, namely, the improvement of the water system; and if there was a change between the original set-up and that now being carried out, such is not shown by the record to constitute a detriment to the citizens or therefore any abuse of such discretion, the stipulation expressly stating:

"IV That at the time of holding said bond election no site had been procured or obtained for the water storage tank referred in the notice of said bond election; that thereafter the Council of the City of Moscow, on

the advice of geologists and engineers, and on estimates furnished by the City Engineer, determined that for the best interests of the City of Moscow, and for economy and efficiency, it was desirable that for the best interests of the City of Moscow that a well be drilled in the southeast part of said City as a part of said City's water system, and to erect the water storage tank near said well, all for the purpose of improving the water system of the City of Moscow; that as a part of the project and pursuant to Ordinance No. 737 of said City to improve the water system of said City, the Council of the City of Moscow, by resolution, passed unanimously on September 5th, 1939, accepted the bid of the petitioners and plaintiffs and entered into a contract with them for the drilling of said well at the stipulated and agreed price of $1.00 per inch in diameter per foot depth of said well; that pursuant to said contract of employment the said petitioners and plaintiffs commenced the drilling of said well and have drilled the same to a depth of approximately 800 feet, and have not yet ceased drilling under said contract of employment."

(*Jack v. Village of Grangeville*, 9 Ida. 291, 74 Pac. 969; *Clyde v. City of Moscow*, 23 Ida. 592, 131 Pac. 381; *McEwen v. City of Coeur d'Alene*, 23 Ida. 746, supra, at 759-60; *Caldwell v. Village of Mountain Home*, 29 Ida. 13, at 23, 156 Pac. 909; *Veatch v. Gibson*, 29 Ida. 609, 160 Pac. 1112; *Bew v. Ventnor City*, 81 N. J. L. 207, 80 Atl. 28; 44 C. J., p. 174, sec. 2305.)

The ordinance submitting the bond issue to the voters of the city was sufficient in scope under the above holdings of this court to justify the city council, in the exercise of its best judgment as the duly elected executive and governing body of the city, charged with the duty and clothed with the power of carrying out the mandate forthcoming from the vote of the people approving the bond issue and thus authorizing the public work thereby sanctioned, in letting the contract for the well. (*Brown v. Village of Grangeville*, 8 Ida. 784, 71 Pac. 151.)

The judgment is therefore reversed and the cause remanded with instructions to issue a permanent writ

requiring the treasure to pay the warrant heretofore issued by the city council. Costs awarded to appellant.

Budge, C.J., Holden, J., and Ailshie, J., concur.

Morgan, J., deeming himself disqualified, did not participate.