## IN THE SUPREME COURT OF THE STATE OF IDAHO

### Docket No. 41956

| | | |
|---|---|---|
| THE CITY OF CHALLIS, an Idaho municipal corporation, | ) ) ) | Boise, February 2015 Term |
| Petitioner-Respondent, | ) ) | 2015 Opinion No. 92 |
| v. | ) ) | Filed: September 25, 2015 |
| CONSENT OF THE GOVERNED CAUCUS, An Idaho unincorporated nonprofit association; and CLARENCE LEUZINGER, an individual, | ) ) ) ) ) | Stephen Kenyon, Clerk

SUBSTITUTE OPINION, THE COURT'S PRIOR OPINION DATED AUGUST 20, 2015 IS HEREBY WITHDRAWN. |
| Respondents-Appellants. | ) ) ) | |

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Custer County. Hon. Alan C. Stephens, District Judge.

The judgment of the district court is <u>reversed</u> and the case is <u>remanded</u> for proceedings consistent with this opinion.

Sawtooth Law Offices, PLLC, Boise, for appellants. David P. Claiborne argued.

Moore Smith Buxton & Turcke, Chtd., Boise, for respondent. Paul J. Fitzer argued.

_____

HORTON, Justice.

This appeal from Custer County relates to proposed repairs and improvements to the City of Challis' (the City) water distribution system. In 2013, the City initiated a judicial confirmation proceeding seeking approval to incur $3.2 million in debt without a public vote. The Consent of the Governed Caucus (the Caucus) challenged the constitutionality of the City's request based upon Article VIII, section 3 of the Idaho Constitution. The district court granted the City's request and the Caucus appealed. We reverse.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The City maintains a drinking water distribution system. In December of 2011, the City commissioned the services of Riedesel Engineering to determine the present and future adequacy of the system with respect to laws and standards of the local fire authority, the Idaho Department

1

of Environmental Quality (DEQ), and the United States Environmental Protection Agency. Riedesel Engineering issued its Challis Water System Facility Plan (the Riedesel Report) in February of 2012, outlining aspects of the water system that needed repair and improvement.

The City initiated this action on August 29, 2013, under Idaho's Judicial Confirmation Law, Idaho Code sections 7-1301, *et seq.* The City sought approval to incur $3.2 million in public indebtedness without a public vote for work on the City's water distribution system. On October 1, 2013, the Caucus appeared and challenged whether the indebtedness was "necessary" under the Idaho Constitution. An evidentiary hearing was held on January 17, 2014. At the hearing, the City presented testimony from its Mayor, Superintendent of Public Works, and Engineer. The Caucus presented testimony from an engineer it had retained.

Three components comprised the proposed work on the City's water system: (1) replacement of meters and installation of a new telemetry system, (2) construction of a new pipeline to the airport, and (3) replacement of aging pipes and fire hydrants in "Old Town."[1]

The metering and telemetry work calls for aging meters to be replaced with automatic meters and the system supervisory control and data acquisition (SCADA) system to be upgraded. Although the current metering and telemetry system is operational, the Riedesel Report identifies several advantages to the proposal. Replacement of the metering system will allow for accurate, year-round determination of water use, permit identification of service leaks, enable recovery of "lost water revenues," and encourage conservation. Installation of a new telemetry system will reduce staff time and improve monitoring capabilities, resulting in enhanced responsiveness to alarms and increased system security.

The airport component of the work calls for extending new six and eight inch mains, along with fire hydrants, to the airport. The airport is not currently tied into the City's water system, relying instead on an independent system supplied with well water. The Riedesel Report reflects that the primary deficiency of the current airport water system is inadequate water flow to meet design fire requirements. This has resulted in increased fire insurance premiums and concern about the potential negative impact on the City's economic attractiveness to businesses which may be considering locating operations within the City.

---

[1] The City has two water storage and distribution systems: Old Town and Cyprus. Old Town is the original water distribution system and Cyprus the newer, having been constructed in the 1980s.

The Old Town work includes replacing old four inch pipes with larger water mains, installing new fire hydrants, looping dead end pipes, installing pressure reduction stations, and making roadway improvements. Although Old Town's water system is currently operational, the outdated system is subject to water main breakage and increased capacity is needed for fire protection purposes. Portions of the Old Town system do not meet current standards imposed by DEQ regulations. However, these regulations also provide that the City is not required to comply with these standards until new construction on the system takes place. In other words, the Old Town system is "grandfathered."

On February 5, 2014, the district court issued its Findings of Fact and Conclusions of Law, holding that the City could incur debt to finance the project without a confirmatory vote of the electorate. The district court entered judgment on March 19, 2014, and the Caucus timely appealed.

## II. STANDARD OF REVIEW

"This Court defers to the factual findings of the district court unless those findings are clearly erroneous. This Court exercises free review of the district court's application of the relevant law to the facts. Constitutional issues are questions of law over which we also exercise free review." *City of Idaho Falls v. Fuhriman*, 149 Idaho 574, 576, 237 P.3d 1200, 1202 (2010) (quoting *City of Boise v. Frazier*, 143 Idaho 1, 2, 137 P.3d 388, 389 (2006)).

## III. ANALYSIS

The Caucus' appeal asserts that Article VIII, section 3 of the Idaho Constitution forbids the City from incurring this debt without a confirmatory vote and that the district court's findings were clearly erroneous. We begin by considering the current status of our jurisprudence relating to this provision of the Idaho Constitution.

### A. An overview of recent case law regarding Article VIII, section 3 of the Idaho Constitution.

"Cities in Idaho are generally barred from incurring debts or liabilities, in excess of the income and revenue provided for debts and liabilities in such year, unless they first conduct an election and secure voter approval of the proposed expenditure, as provided in Article VIII, § 3 of the Idaho Constitution." *Fuhriman*, 149 Idaho at 576–77, 237 P.3d at 1202–03. This constitutional provision contains an exception, known as the proviso clause, that no voter approval is required if the expenditure is for "ordinary and necessary expenses authorized by the

3

general laws of the state . . . ." Idaho Const. art. VIII, § 3. The words "ordinary" and "necessary" are "read in the conjunctive."[2] *Frazier*, 143 Idaho at 4, 137 P.3d at 391.

In *Frazier*, this Court summarized the circumstances surrounding adoption of Article VIII, section 3 of Idaho's Constitution:

> Article VIII, § 3 has been part of Idaho's Constitution since the beginning of statehood. The draft version of Article VIII, § 3 that was submitted to the 1889 Idaho Constitutional Convention was modeled after and nearly identical to Article XI, § 18 of the California Constitution of 1879. *See* 1 PROCEEDINGS AND DEBATES OF THE CONSTITUTIONAL CONVENTION OF IDAHO 1889, 589 (1912) (henceforth 1 PROCEEDINGS); CAL. CONST. of 1879, Art. XI, § 18. The intention was to prevent local government entities from incurring debts without approval from the voters and a clear plan to retire those debts. DONALD CROWLEY & FLORENCE HEFFRON, THE IDAHO STATE CONSTITUTION 170 (1994).
>
> Broadly speaking, Article VIII, § 3 imposes two requirements to be met by local governments before incurring indebtedness. The first requirement is a public election securing two-thirds of the vote, and the second is the collection of an annual tax sufficient to pay the debt within thirty years. The remainder of the section consists of exceptions to those requirements, beginning with the previously mentioned proviso clause and continuing with language added in a series of subsequent amendments not applicable to our analysis.
>
> When the draft version of Article VIII, § 3 was presented to the constitutional convention, it was amended by the delegates to add the words "provided, that this section shall not be construed to apply to the ordinary and necessary expenses authorized by the general laws of the state." *See* IDAHO CONST. art VIII, § 3; 1 PROCEEDINGS at 584–94. Delegate William Claggett offered the original proviso clause. *See* 1 PROCEEDINGS at 586. Claggett explained his intent to the other delegates, stating: "[w]e all know that in the practical administration of county government, that there sometimes will be extraordinary expenses, I mean extraordinary expenses in the ordinary administration of affairs." *Id.* at 588. By way of example, Claggett mentioned the payment of witness fees. *Id.* Other delegates mentioned juror fees and criminal court expenses, *id.* at 590, the expense of controlling streams and ditches, *id.* at 592, and "any emergency" *id.* at 587.

*Frazier*, 143 Idaho at 3–4, 137 P.3d at 390–91.

Originally this Court interpreted the proviso clause "very narrowly," but as time went on this Court "interpreted the 'ordinary and necessary' language more broadly." *Asson v. City of Burley*, 105 Idaho 432, 441–42, 670 P.2d 839, 848–49 (1983). However, this Court returned to the proviso clause's original, narrow interpretation in *Frazier* and decided the case using a "bright-line rule" originally used in *Dunbar v. Bd. of Comm'rs of Canyon Cnty.*, 5 Idaho 407,

---

[2] The parties to this appeal agree that the proposed project is an "ordinary" expense. Thus, this opinion will focus on whether the proposed expenditure is "necessary."

412, 49 P. 409, 411 (1897). *Fuhriman*, 149 Idaho at 578, 237 P.3d at 1204; *Frazier*, 143 Idaho at 4, 137 P.3d at 391. This bright-line rule provides that "in order for an expenditure to qualify as 'necessary' under the proviso clause of Article VIII, § 3 there must exist a necessity for making the expenditure *at or during such year*." *Fuhriman*, 149 Idaho at 578, 237 P.3d at 1204 (emphasis original) (quoting *Frazier*, 143 Idaho at 4, 137 P.3d at 391). "The required urgency can result from a number of possible causes, such as threats to public safety, the need for repairs, maintenance, or preservation of existing property, or a legal obligation to make the expenditure without delay." *Id.* (quoting *Frazier*, 143 Idaho at 6–7, 137 P.3d at 393–94). This Court reasoned that this rule aligns:

> closely with the types of expenditures the delegates at the Idaho Constitutional Convention discussed when they debated Article VIII, § 3 of our state constitution. Those expenditures included unavoidable expenses, such as carrying on criminal trials and abating flood damage, that could not be delayed. We observe that the expenditures contemplated by the delegates involved immediate or emergency expenses, such as those involving public safety, or expenses the government entity in question was legally obligated to perform promptly.

*Frazier*, 143 Idaho at 4, 137 P.3d at 391 (citation omitted).

**B. The district court erred by failing to apply the legal standard for determination of what constitutes a "necessary" expense under Article VIII, section 3 of the Idaho Constitution as articulated in *Fuhriman* and *Frazier*.**

The district court did not discuss our decisions in *Frazier* and *Fuhriman* as to what constitutes a necessary expense.[3] Instead, the district court held that the expenditure need not be "urgent," stating:

> an expense can be necessary without an immediate "urgency" or emergency if the repair is necessary for the good of the public health and safety. This Court finds that the proposed repairs do not need to be "urgent" in the sense that Respondents argue, but instead the repairs must be *necessary* under the meaning of the Idaho Constitution.

This statement is inconsistent with the legal principles articulated in *Fuhriman* and *Frazier*. In both cases, we repeatedly referred to the "urgency" of a necessary expense for which indebtedness may be incurred without an approving vote of the electorate. *Fuhriman*, 149 Idaho at 578–79, 237 P.3d at 1204–05; *Frazier*, 143 Idaho at 6, 137 P.3d at 393.

---

[3] The district court did cite to *Frazier* on one occasion. However, this citation related to the definition of "ordinary" for purposes of Article VIII, section 3. As noted, there is no dispute that the proposed project would be an ordinary expense.

The Caucus argues the district court erred by failing to apply the principles articulated in these decisions, contending that there must be a necessity for making the expenditure during the year at issue. The City responds that the Caucus' "absolutist interpretation" ignores (1) the repair and maintenance and (2) public safety exceptions to Article VIII, section 3 of the Idaho Constitution, which apply without temporal limitation.

This Court has previously addressed the first exception claimed by the City. In *Fuhriman*, we expressly rejected the municipality's contention that expenses arising "in the ordinary administration of local government affairs, such as repairs [and] maintenance" are exempt from the "necessity-requires-urgency analysis." *Fuhriman*, 149 Idaho at 578–79, 237 P.3d at 1204–05. There, Idaho Falls sought to incur a long-term liability under a power sales agreement for the benefit of its municipal electric utility. *Id.* at 575–76, 237 P.3d at 1201–02. We held that the "necessity-requires-urgency" analysis applied and the "exception" advocated by Idaho Falls did not apply, stating:

> Idaho Falls appears to advocate a "know it when we see it" factual inquiry for determining whether liabilities or indebtedness incurred by counties or municipalities are "ordinary and necessary." We shall not stray from the principle of *stare decisis* without an exceptionally compelling reason to do so, particularly where doing so would be a move to embrace ambiguity over order.

*Id.* at 579, 237 P.3d at 1205. The Court reasoned that Idaho Falls could continue to provide power through short-term, albeit more expensive, agreements while it came up with a more lasting solution subject to a confirmatory vote. *Id.*

This Court has not explicitly addressed the question whether the "necessity-requires-urgency" analysis applies in instances where public safety is implicated. The City correctly observes that our past decisions have taken an expansive view of public safety considerations when evaluating whether expenditures were ordinary and necessary. *See City of Pocatello v. Peterson*, 93 Idaho 774, 778, 473 P.2d 644, 648 (1970) (replacement of an "inadequate" and "unsound" airport terminal held to be a "necessary" expense); *Bd. of Cnty. Comm'rs of Twin Falls Cnty. v. Idaho Health Facilities Auth.*, 96 Idaho 498, 510, 531 P.2d 588, 600 (1974) (holding that improvements to hospital structure in order to comply with state safety standards was an "ordinary and necessary" expense). *Frazier* did not overrule these earlier decisions, choosing instead to characterize them as "broadly consistent" with the *Dunbar* rule. *Frazier*, 143 Idaho at 4, 137 P.3d at 391.

6

We take this opportunity to reiterate our holding in *Frazier* and *Fuhriman*. The "necessity-requires-urgency" analysis governs all expenditures, regardless of the underlying purpose. In *Fuhriman*, when discussing this analysis, we quoted from *Frazier*, observing that "[t]he required urgency can result from a number of possible causes, such as *threats to public safety*, the need for repairs, maintenance, or preservation of existing property, or a legal obligation to make the expenditure without delay." *Fuhriman*, 149 Idaho at 578, 237 P.3d at 1204 (quoting *Frazier*, 143 Idaho at 6–7, 137 P.3d at 393–94). For these reasons, we conclude that the district court erred by failing to apply the legal analysis articulated in *Fuhriman* and *Frazier* when considering whether the City's proposal constituted a "necessary" expense under the Idaho Constitution.

## C. This Court must consider the project as a whole.

The parties concur on one point of law: a court is without power to partially grant judicial confirmation of a bond, obligation, or agreement. We agree that courts lack the authority to approve some aspects of a proposal while rejecting others. Idaho Code section 7-1308(2) charges the district court with the responsibility of determining "if the political subdivision is entitled to the relief sought." Nothing within the Judicial Confirmation Law may be interpreted as granting the district court authority analogous to a line-item veto. Here, the City's petition asked the district court to confirm "whether or not the proposed promissory note or other obligation evidencing" $3.2 million in debt "constitutes an 'ordinary and necessary expense.'"

## D. The district court erred in finding the project to be "necessary" under the test provided in *Fuhriman*, *Frazier*, and *Dunbar*.

We must now determine whether the proposed project is "necessary." As previously noted, the proposed project has three components, (1) the meter and telemetry upgrades, (2) the airport expansion, and (3) the Old Town water line replacement.

The district court determined the metering upgrades were necessary for accurate billing and water conservation. It also determined the telemetry upgrades were "necessary" "to provide security to the system." The Caucus argues installing "new high-tech metering and telemetry" is not truly urgent because the City discussed the project for four years and there is already a workable metering system. The City responds that telemetry upgrades are necessary to prevent unauthorized entry to facilities and potential threats to the water distribution system. It further argues meter replacement is necessary for water conservation and equitably charging users for the amount of water they actually consume.

7

In *Fuhriman*, we discussed our earlier decision in *Bannock Cnty. v. C. Bunting & Co.*, 4 Idaho 156, 37 P. 277 (1894) *overruled on other grounds by Veatch v. City of Moscow*, 18 Idaho 313, 109 P. 722 (1910), stating:

> In *Bannock County v. C. Bunting & Co.*, this Court found Bannock County's expenditures for the provision of a temporary jail were ordinary and necessary. 4 Idaho 156, 37 P. 277 (1894) *overruled in part on other grounds by Veatch v. City of Moscow*, 18 Idaho 313, 109 P. 722 (1910). However, we went on to clarify that, although Bannock County was obligated to provide a facility to act as a jail, "such rooms must be temporarily provided, at as little expense as is consistent with providing suitable quarters, until the question can be submitted to the people." *Id.* at 168, 37 P. at 281. In accordance with this reasoning Idaho Falls must obtain electricity on a temporary basis unless and until a long-term agreement is confirmed by two-thirds of its qualified electors.

149 Idaho at 579, 237 P.3d at 1205. Additionally, we quoted *Frazier*'s discussion of the thrifty inclinations of the framers of the Idaho Constitution:

> The Idaho Constitution is imbued with the spirit of economy, and in so far as possible it imposes upon the political subdivisions of the state a pay-as-you-go system of finance. The rule is that, without the express assent of the qualified electors, municipal officers are not to incur debts for which they have not the funds to pay. Such policy entails a measure of crudity and inefficiency in local government, but doubtless the men who drafted the Constitution, having in mind disastrous examples of optimism and extravagance on the part of public officials, thought best to sacrifice a measure of efficiency for a degree of safety. The careful, thrifty citizen sometimes gets along with a crude instrumentality until he is able to purchase and pay for something better. And likewise, under the Constitution, county officers must use the means they have for making fair and equitable assessments until they are able to pay for something more efficient or obtain the consent of those in whose interests they are supposed to act.

*Id.* at 579–80, 237 P.3d at 1205–06 (quoting *Frazier*, 143 Idaho at 5, 137 P.3d at 392).

Here, the Riedesel Report indicates the proposed metering and telemetry projects are largely motivated by economic interests. It stated: "Even though metering is not a health and safety priority, our analysis indicates the construction cost may be significantly (if not completely) offset by the labor saving to read the meters and process water bills." Regarding telemetry it stated:

> The City of Challis currently has minimal telemetry/supervisory control and data acquisition (SCADA) capability, and relies on visual inspections and site visits to monitor operation of its pumps and water storage elements. A more robust SCADA system will reduce staff time, improve overall monitoring of key elements, enhance reporting and response of alarm conditions, and improve the security of the system.

8

The testimony of Donald Acheson, the City Engineer, also supports these conclusions. He testified that meter replacement was necessary for water conservation and for "equitably distributing" the cost of water use. He also testified that the meters in the City were from the 1980s, were beyond a meter's typical life-span, and were inefficient. Regarding telemetry, Acheson testified the telemetry improvements would promote public safety.

Applying the relevant law to these facts, we cannot say that the proposed metering and telemetry upgrades are necessary. As with the proposed long-term power agreement in *Fuhriman*, metering and telemetry upgrades are undoubtedly desirable from an economic perspective. However, the need for these upgrades cannot be characterized as urgent. As with the temporary jail in *Bannock County* the City must get by with what it has until it obtains approval for these expenditures from the electorate.

The City also argues that "[t]here is no Idaho precedent wherein this Court parceled out individual aspects of a project" and compares this Court's concerns about the expense of metering and telemetry to questioning whether an "additional bathroom facility should or should not be included." We do not agree. The estimated construction costs of aspects of the project are as follows:

|  |  | Estimated Construction Cost |
|---|---|---|
| 1. | Old Town Improvements | $ 920,853 |
| 2. | Airport Extension | $ 563,178 |
| 3. | Metering & Telemetry | $ 645,036 |
|  | Estimated Construction Total | $ 2,129,066 |
| 4. | Contingencies | $ 236,827 |
| 5. | Design Engineering, Bidding & Award | $ 348,715 |
| 6. | Construction Observation, Testing & Administration | $ 207,352 |
| 7. | Other (Legal, Interest & Grant Administration) | $ 115,000 |
|  | TOTAL ESTIMATED PROJECT | $ 3,036,960 |

At $645,036 the metering and telemetry upgrades constitute over 30% of the total estimated construction costs. We are unable to conclude that metering and telemetry is just a small portion of the project that we may overlook.

The metering and telemetry upgrades cannot be characterized as "necessary." Because this portion of the project is not necessary from a constitutional perspective, the district court erred in granting the petition for judicial confirmation. In light of this conclusion, we need not consider the parties' arguments regarding the necessity of the airport extension and replacement of water lines in Old Town.

**E. We award the Caucus attorney fees under Idaho Code section 7-1313.**

Both parties request attorney fees. Since the City is not the prevailing party, it is not entitled to an award of attorney fees. The Caucus requests attorney fees on appeal and for the proceedings before the district court under Idaho Code section 7-1313. This statute provides:

> Whenever a court shall determine that a political subdivision is not entitled to the relief sought or that this chapter has not been substantially complied with and enters a judgment denying the petition, the court *shall award reasonable attorney fees* to any owner of property, taxpayer, qualified elector or rate payor or any other interested person who has appeared and moved to dismiss or answer the petition.

In *Frazier*, 143 Idaho at 7, 137 P.3d at 394, we awarded attorney fees and remanded "to the district court pursuant to I.C. § 7–1313 and I.R.C.P. 54 for a determination of costs and a reasonable sum of attorney fees below and on appeal" after a party challenging Boise's plan to build an airport parking garage prevailed on appeal. As the statute is mandatory, the Caucus is entitled to an award of attorney fees incurred in the prior proceedings and in this appeal. However, we erred in one procedural aspect in *Frazier*. It is not the district court's responsibility to determine an appropriate award of fees and costs incurred on appeal; rather, that is our duty. Accordingly, this matter will be remanded to the district court with directions to ascertain and award the Caucus reasonable attorney fees and costs incurred in the prior proceedings in the district court. In the event that the Caucus timely submits a memorandum of costs and fees, *see* Rules 40(c) and 41(d), I.A.R., this Court will evaluate that memorandum, and any objections thereto, to determine an appropriate award of attorney fees and costs.

### IV. CONCLUSION

We reverse the district court's judgment granting judicial confirmation of the City's proposed $3.2 million indebtedness for expenses related to repair and improvement of its water distribution system. This case is remanded to the district court with directions to ascertain and award the Caucus reasonable attorney fees and costs incurred in the proceedings below. We award attorney fees and costs on appeal to the Caucus.

Justices EISMANN and W. JONES, **CONCUR**.

J. JONES, Chief Justice, dissenting.

I dissent because I am unable to agree with the Court's conclusion that Article VIII, section 3 of the Idaho Constitution requires a vote of the people for the maintenance or

10

modernization of an existing city water system. The framers of the Idaho Constitution were thrifty people, concerned about the possibility of county and city governments incurring unnecessary debt, but they were also practical people who looked to the future. They hoped and expected that cities in Idaho would grow, that municipal services for those cities would necessarily expand, and that such services would require periodic updating. And, they did not want to place unnecessary fiscal restraints upon county and municipal governments. This is reflected in the proceedings of the constitutional convention relating to Article VIII.

As originally proposed, section 3 would have required a two-thirds vote of qualified electors for any indebtedness exceeding the income and revenue of the governmental entity for the current year. The convention president, Judge William Claggett from Shoshone County, proposed the proviso clause out of concern that, without it, Article VIII, section 3, "would prohibit the issuance of county scrip to pay the ordinary indebtedness absolutely imposed upon the county as provided by law, in case there should be any heavy expenses . . . exceeding the current revenues of that year." He observed that Article III, section 3 was "intended to apply to special indebtedness." 1 PROCEEDINGS AND DEBATES OF THE CONSTITUTIONAL CONVENTION OF IDAHO 1889, 587 (1912) (hereafter 1 Proceedings). In support of the amendment adding the proviso clause, Judge Claggett argued:

> We all know that in the practical administration of county government, that there sometimes will be extraordinary expenses, I mean extraordinary expenses in the ordinary administration of affairs. I am not speaking now of special indebtedness at all, but the ordinary general indebtedness which is incurred in the way of administration of county affairs. . . .[T]he object of the proviso . . . is to limit [section 3] to such indebtedness as does not arise under the ordinary administration of the county.

1 Proceedings at 588−89.

W.B. Heyburn from Shoshone County argued in favor of the proviso clause, pointing out that it was expensive and impractical to require an election every time a county incurred indebtedness in excess of current year revenues. He said, "[W]e don't want to leave any part of the ordinary legitimate expenses of running county government in doubt, and we don't want to call a county election for the purpose of making up a deficit of four or five hundred dollars at the end of the year, because the costs of the election are very considerable in a county such as ours." 1 Proceedings at 591.

H.S. Hampton from Cassia County offered a substitute for the proviso clause, limiting it to "necessary court expenses." 1 Proceedings at 591−92. P.J. Pefley from Ada County opposed the substitute, arguing:

> It occurs to me if that motion should prevail it would cut cities off. Now we are liable to fall short in our ordinary levy in this city. We have streams running adjacent through the city that in time of high water, and ditches all the time, that are liable as I said to break away and run down through the city, and if we had to wait to hold an election and get two-thirds of the voters to ratify another levy, the whole city might be ruined before it could be abated, and I would not like to see anything of that kind occur. I think it should apply to cities and counties alike and all corporations, that they should be allowed in contingencies to abate them immediately without waiting for an election to be ratified by two-thirds.

1 Proceedings at 592. The substitute amendment was rejected and the proviso clause was adopted by the convention.

The convention then turned to consideration of a proposed section 4 to Article VIII, which apparently limited the indebtedness authorized to be incurred by governmental subdivisions to five percent on the assessed value of their property. 1 Proceedings at 598. Substantial objections were made to the proposed limitation. The debate on section 4 is relevant here, as it sheds light on the intent of the delegates as to the proviso clause upon which they had just acted.

> W.B. Heyburn moved to strike section 4, saying,

> if it is not stricken out, as far as the members of this convention from Shoshone county are concerned, they can just go home, because they will have no interest in the state government whatever. It will completely fence them in, either with the amendment or as it was originally reported. . . . The wheels of their government will be stopped, whenever you adopt that section, right there. . . . We have a government that must be kept in motion.

1 Proceedings at 599−600. J.W. Poe from Nez Perce County agreed, arguing:

> I heartily support the motion of the gentleman from Shoshone, Mr. Heyburn. I don't think these city corporations or town corporations ought to be circumscribed as to the powers of appropriation or indebtedness they may create. They are the parties who will have to suffer the consequences of any unnecessary schemes there may be that are abetted by reason of an appropriation for any amount which may be excessive. . . . I heartily support the motion to take that section out of the constitution, and leave the cities the opportunity if they see proper, to make appropriations for sewerage, sanitary purposes, or any other thing which in their judgment they may believe will inure to the advantage of their city or town or to their county. Leave it to them.

1 Proceedings at 600−01.

Edgar Wilson from Ada County argued, "[I]f the section does prevail it paralyzes different improvements in this city and will ruin municipal improvements in half a dozen towns in Idaho Territory." 1 Proceedings at 601. W.C.B. Allen from Logan County said, "I think it is limiting the powers of the state in such respects as would prevent its prosperity and progress and prevent it from issuing bonds for carrying on public work." 1 Proceedings at 602. Section 4 was stricken by the convention.

None of the delegates indicated that there must be a great sense of urgency in the present year for a governmental subdivision to incur indebtedness exceeding revenues or income in order to repair or improve existing infrastructure. Mr. Pefley clearly indicated that he understood the proviso clause to allow debt to be incurred in order to make improvements to a city's existing ditch system before damage was incurred. He did not indicate that the potential damage had to be of an immediate nature. Again, these people were practical and knew that once you established a ditch system, a fire department, a municipal water distribution system, or some other public facility authorized by law, maintenance and modernization were necessary to keep the facility in good operating condition. They intended Idaho cities to expand and did not express any notion that each time an improvement was necessary, an election would be required.

The urgency expressed in *Dunbar v. Bd. of Comm'rs of Canyon Cnty.*, 5 Idaho 407, 412, 49 P. 409, 411 (1897), where the Court said, "there must exist a necessity for making the expenditure at or during such year," is unsupported by any argument made by the delegates at the convention. Indeed, the comment was unnecessary to the Court's decision because *Dunbar* was decided on the ordinary prong of the proviso clause, rather than the necessary prong. The Court's holding said:

> We conclude that the building of a bridge and the payment of scalp bounties are not ordinary, but extraordinary, expenses, and, being such, cannot be created in excess of the revenue for the fiscal year in which they may be incurred without the assent of two-thirds of the electors of the county voting at an election duly called and held.

*Id.* The holding did not address the necessity issue. The holding was, however, contrary to Judge Claggett's admonishment that the proviso was not intended to prohibit "extraordinary expenses in the ordinary administration of affairs." 1 Proceedings at 588. He specifically stated that what the proviso clause did not countenance was "special indebtedness." Further, the two expenditures

13

at issue in the *Dunbar* case were for new items—a new bridge and a new scalp bounty—rather than for continuation of existing programs or expenditures.

Of interest is the fact that the Court did not even acknowledge the *Dunbar* holding in a case decided just 15 years later, pertaining to the repair and improvement of a city water system. In *Hickey v. City of Nampa*, 22 Idaho 41, 124 P. 280 (1912), the Court was considering whether planned expenditures to repair and improve the water system of the City of Nampa required the vote of the city's qualified electors under Art. VIII, section 3. The system had sustained fire damage. The Court held that a vote was unnecessary, saying:

> The city of Nampa had duly and regularly exercised the power and authority conferred upon it by the provisions of subdivisions 36 and 37 of section 2238, Rev. Codes, in acquiring and maintaining a waterworks system and apparatus and appliances for extinguishing fires. In order for this property to be of any value to the city, it was necessary for it to be kept in repair. When the fire came and the waterworks system was impaired and rendered useless, it was necessary that the city repair and restore it. It was also equally necessary to have fire equipment and apparatus to enable it to properly utilize the water in case of fire. . . . It appears in this case that the mayor and city council acted in good faith, and that this was a bona fide improvement and restoration of property, within the purview and meaning of the statute.
>
> The city council could certainly not use this as a subterfuge for the construction or purchase of a <u>new system</u> of waterworks or other independent, separate, or <u>new property</u>, so as to contravene the provisions of section 3, art. 8, of the Constitution. . . . We take it that it was within the power of the Legislature, under [Article VIII, section 3] to say that an *expenditure*, though out of the *ordinary*, which is incurred for the purpose of repairing some damage done to city property, or <u>improving it in such manner as to render it serviceable to the city</u>, falls within this proviso to the Constitution. <u>The repair and improvement of the property may be "ordinary and necessary," and yet not occur frequently. It is one of the incidents of the ownership of property that it must be kept in repair</u> . . .

22 Idaho at 44−45, 124 P. at 281. (underlined emphasis added). The Court made no mention of the *Dunbar* dicta that "there must exist a necessity for making the expenditure at or during such year."

Notwithstanding that the urgency language in *Dunbar* appears to have been unnecessary to the decision in that case and unsupported by any debate at the constitution convention, it was cited to and given legs in *City of Boise v. Frazier*, 143 Idaho 1, 4, 137 P.3d 388, 391 (2006). It then was given additional credibility in *City of Idaho Falls v. Fuhriman*, 149 Idaho 574, 578, 237 P.3d 1200, 1204 (2010). With this shaky foundation, it also makes its way into the Court's

14

present opinion. It is inconsistent with the constitutional convention debate and should be disregarded.

The main focus of the inquiry should be directed to the issue of whether the governmental entity proposes a new program or facility or whether the proposed expenditure is for an existing program or repair or modernization of an existing facility. That was, in fact, the issue decided by the Court in both *Dunbar* and *Frazier*. In *Dunbar*, the question was whether a new bridge could be built without a vote of the electors where the cost would exceed the current year's income. In *Frazier*, the question was whether "[c]onverting a flat parking lot into a five floor parking garage," an expansion "so profound as to constitute an entirely new construction" was "necessary" within the meaning of the proviso clause. *Id.* at 6, 137 P.3d at 393.

It is true that the Court has zigged and zagged over the years as to the scope of the proviso clause, sometimes giving it a broader reading and at other times a narrower reading. This is reflected in the Court's discussion of previous decisions in *Asson v. City of Burley*, 105 Idaho 432, 441−42, 670 P.2d 839, 848−49 (1983), and of cases discussed in the various opinions in *Frazier* and *Fuhriman*. Nevertheless, what has been fairly consistent is the recognition of a dichotomy between new programs or construction, which require a vote of the electors, and support or expansion of existing governmental facilities or functions, which do not.

Earlier cases dealing with water systems are instructive. In *Woodward v. City of Grangeville*, 13 Idaho 652, 660, 92 P. 840, 842 (1907), the Court held that the City of Grangeville was not authorized, without a vote of the electors, to purchase an existing water system from the estate of a deceased city resident. However, in the *Hickey* case, we held that the City of Nampa was authorized, without voter approval, to repair and improve an existing water system. Likewise, a decision by the City of Moscow to drill a new well to support a voter-approved plan to improve an existing water system and build a water storage tank to provide a "more adequate water supply" did not necessitate a vote of the people. The well was not approved by the voters but the Court deemed it necessary to the project nevertheless. *Durand v. Cline*, 63 Idaho 304, 312−13, 119 P.2d 891, 894−95 (1941).

Aside from its errant reliance on *Dunbar* for the urgency element, the *Frazier* Court merely followed the long-standing dichotomy between new construction, on the one hand, and maintenance of an existing facility, on the other. The expensive new parking garage in *Frazier* was clearly not exempt under the proviso clause and, therefore, a vote was required under article

VIII, section 3. The *Dunbar* urgency language was not actually necessary for the Court's holding.

Turning to the case at hand, there is no question but that the Challis water project involved ordinary expenditures. The City of Challis had exercised its power under Idaho Code section 50-323 to construct and operate a domestic water system; had acted pursuant to Idaho Code section 50-309 to maintain a fire department and "to provide water for fire purposes" in the city; and decided to operate and maintain an airport, as authorized by Idaho Code section 50-321. The question is whether the three elements of the water project presented here are within the necessary prong of the proviso clause.

In this regard, the district court made the following pertinent findings of fact:

8. As the owner and operator of the [water] System, the City is charged with the duty of maintaining safe and reliable services for the City and its residents, and to do so in a manner that does not jeopardize the City's drinking water supply and provides sufficient fire flow. In furtherance of that responsibility in December 2011, the City retained the services of Riedesel Engineering, a professional consulting civil engineering firm duly authorized and licensed to practice in Idaho (the "Engineer"), to conduct a study of the System for the purpose of determining the adequacy of the System for present and future needs with respect to standards established by the local fire authority, the State of Idaho through its Department of Environmental Quality ("DEQ") and the United States Environmental Protection Agency ("EPA"). The Engineer performed a study entitled "City of Challis Water Facility Plan" along with the supplemental information and emergency protocol for the City's existing water system (DEQ No. 11-13-19) (the "Study").

9. The most recent water system facility plan and resulting improvement project performed for the City had dated from 1981 and is approximately 30 years old. The residential services and meters installed with the 1980s capital project are aged and need to be replaced.

10. However, the majority of the system, the Old Town distribution system, dates back to the 1930s. These pipes have reached their useful life and are now dilapidated and in need of replacement resulting in multiple breaches in the city, including several this year. Should a breach occur in a main section of this distribution line, entire sections of the City could be without water.

11. Although no enforcement action has been brought against the City, the City's system is not in compliance with State law.

a. The City is not able to provide adequate fire flows due to the use of existing four (4) inch old and dead end water mains, and small diameter

16

un-looped lines. IDAPA 58.01.08.542.06 addresses the size of water mains. The section provides that where fire hydrants are provided, they shall not be connected to water mains smaller than six (6) inches in diameter, and fire hydrants shall not be installed unless fire flow volumes are available.

b.      As testified to by the engineer and the public works director, all of the 130 fire hydrants are in need of replacement because they contain dilapidated componentry that cannot be serviced. To date only 25-30 have been replaced.

c.      However, the hydrants are connected to four (4) inch lines. Pursuant to IDAPA 58.01.08.50 the adequacy of the water system fire flow capacity is determined by the local fire authority. The Challis system does not meet the minimum standard established by the local fire authority, Chief Gunderson, who expressed concerns that the Challis' system limits the District's ability to fight a fire. The concerns include

   i.      The use of 4 inch lines in violation of IDAPA 58.01.08.542.06.

   ii.     Improper spacing of fire hydrants in violation of IFC Appendix B, Table C105.1.

   iii.    The existing distribution system cannot meet peak hour demand with the design fire criteria in violation of IDAPA 58.01.08.552.01.b.i.

   iv.     Many of the fire hydrants are dysfunctional.

   v.      The public works director testified that the fire hydrants provide suitable flow for only approximately 45 seconds.

   vi.     In short, the fire chief, engineer, and public works director expressed concerns that the system cannot effectively fight a fire.

12.     In order to repair this preexisting and obligatory utility, achieve compliance with state law minimum safety regulations, and obtain the required amount of fire flow to protect the health and safety of the citizenry, the Study (which as a planning document contains over $8 million dollars of recommended upgrades) was [pared] down to meet the immediate needs of the System totaling $2,129,066 in repairs and replacement plus additional estimated funding requirements for contingencies, design engineering, bidding, testing, and other costs total $3,036,960. These include:

a.      Construction of distribution system improvements to tie the Old Town system eliminating the 4-inch pipes and the fire hydrants that tie to them, install new and properly spaced fire hydrants, and tie-in dead end lines. Add pressure reducing stations and isolation valves to create (4) pressure zones which eliminates service areas that are over-pressurized.

b.      Install a telemetry system to improve supervisory control and data acquisition to protect the water system.

17

c. Replace metering with new automated read (AMR) equipment taking the first steps to recover the estimated 4% lost water identified by Idaho Rural Water, which will provide accuracy of water usage, but more importantly the billing, which is necessary precondition for DEQ approval, funding and to comply with a water audit.

d. Installation of a transmission pipeline to provide minimum supply of water necessary for firefighting service to the Challis Airport as determined by the fire authority, Chief Gunderson.

13. Donald Acheson, the city engineer believes that a piecemeal approach to the replacement of the aging componentry does not mitigate the danger to the public safety as a system is only as strong as its weakest link, and it is not foreseeable as to exactly where the breach or fire will occur.

14. Based on the Study and other available information, the City's Mayor and Council have determined that the proposed improvements are necessary to meet the present and immediate needs of the City. The improvements are essential to ensure that the System remains functional and adequate to meet the requirements of Idaho law and provide for minimum required fire flow protection both in old town and to the airport, and to provide security for this valuable resource. Additionally, the replacement of pipes, hydrants, meters, and telemetry are part of a regular, ordinary, and necessary maintenance of a preexisting and obligatory utility.

These findings certainly appear to be supported by the record.

The Caucus does not identify and attack specific factual findings made by the district court but, rather, devotes one and one-third pages of its opening brief to arguing that no evidence supported the Court's "determination that the Project was necessary for fire protection, health or welfare." The Caucus claims that expenses for repair or maintenance of a water system do not qualify as necessary within the meaning of the proviso clause unless "recent casualty or accident . . . impaired the System," citing *Hickey*. The Caucus contends that since the City "is presently providing its users with clean drinking water," and because what the City "proposes is a permanent solution to a future risk," the proviso clause does not allow the proposed expenditures. The Caucus claims that since there is no evidence that the City is not presently able to fight actual fires, there is no necessity to address the problem with the aging 4-inch pipes, dilapidated componentry, and inadequate existing system at the airport.

Essentially, the Caucus takes the position that since there has not been an actual breakdown or disaster, the water system cannot be repaired, improved, expanded, or modernized, without a vote of the people. This attitude appears to be at odds with the forward-looking, optimistic, and expansive views exhibited by Idaho's constitutional framers.

18

It is clear from the convention proceedings that the framers of the Constitution were hopeful about Idaho's future. They wanted and expected towns to grow and prosper. They knew that towns would grow into cities, and that cities would expand to accommodate growing populations and would need to continually modernize their existing facilities. They wanted governing bodies to exercise caution in implementing new programs and constructing new facilities and, therefore, required a vote of electors for those purposes. But, they knew that, once approved, the new infrastructure would need to be maintained, expanded for growing communities, and modernized to keep it up to date. For those purposes they adopted the proviso clause. It was clear from the debate that they did not want to hamstring cities by requiring that they hold a vote every time some existing facility needed to be expanded or modernized. That was just an inherent part of voter approval of a new project or a new facility, just as digging a new well was an inherent part of improving the water system in *Durand*.

The City determined that expenditures were necessary to improve the water system by replacing old infrastructure within the city proper, to extend the system to the City airport, and to improve the means for conserving and accounting for water with modern telemetry. None of this entailed establishing a new program but, rather, was to maintain and modernize the existing system and make it available to the City's airport.

Even though the City had good drinking water and had not suffered catastrophic failure of the distribution system, it was clearly dilapidated and out of date, had many dysfunctional fire hydrants, and was crying out for replacement. The airport was not connected to the main water system and its own water system was inadequate, particularly with respect to fire protection. The new controls were necessary to conserve water, to improve accountability, and to protect the integrity of the system. Just as it would not be appropriate to require that voters approve the modernization of county or city accounting and recordkeeping from pen and pencil to computers, it shouldn't require a vote to modernize the controls of a city water system from manual to electronic. That is just an inherent part of owning infrastructure. As the Court said in *Hickey*, "[i]n order for this property to be of any value to the city, it was necessary for it to be kept in repair." 22 Idaho at 44, 124 P. at 281.

The district court did a good job of analyzing the issues presented and its decision was in keeping with the spirit of the Idaho constitutional drafters. I would affirm.

Justice BURDICK CONCURS.