BURDICK, Justice.
Jared Fuhriman, mayor of the city of Idaho Falls, appeals the district court’s order confirming the validity of a power sales agreement (PSA), and related creditworthiness agreement (CA), pursuant to the Judicial Confirmation Law.[1] Both agreements are between Idaho Falls’s municipal electric utility Idaho Falls Power (IFP) and the United States of America, Department of Energy, acting by-and-through the Bonneville Power Administration (BPA). Fuhriman argues that the district court erred in finding that the city of Idaho Falls (Idaho Falls) could incur public liability by entering into the seventeen-year PSA without first submitting the PSA to a public vote. Fuhriman argues *576 that the obligations incurred by Idaho Falls under the PSA are ordinary, but not necessary, expenses under Article VIII, § 3 of the Idaho Constitution.[2]
I.FACTUAL AND PROCEDURAL BACKGROUND
Idaho Falls owns and operates a municipal electric utility, IFP, which provides electricity to customers located within the established service area. IFP owns two hydroelectric generation facilities, but these only generate approximately 10% of IFP’s electricity needs, and Idaho Falls currently purchases the remainder of its electricity from BPA under a power purchase agreement that expires on September 30, 2011.
To replace the power purchase agreement that is set to expire, Idaho Falls intends to begin purchasing electricity from BPA pursuant to the PSA beginning October 1, 2011. The PSA creates an obligation for Idaho Falls to purchase power and energy from BPA, and for BPA to sell power and energy to Idaho Falls, for a seventeen-year term commencing on October 1, 2011. These obligations are firm unless an “uncontrollable force” precludes performance. Under the PSA, Idaho Falls will purchase “Slice”[3] and “Block”[4] products from BPA. BPA requires customers purchasing the “Slice” product to execute a creditworthiness agreement. The CA provides that, upon the occurrence of certain events, Idaho Falls may be required to post cash or a letter of credit to secure its payment obligations under the PSA.
Idaho Falls filed a petition under Idaho’s Judicial Confirmation Law, I.C. § 7-1301, et seq., on March 19, 2009, requesting a determination that Idaho Falls’s obligations under the PSA are “ordinary and necessary expenses” under Article VIII, § 3, of the Idaho Constitution, and a determination that the CA did not create any new or additional obligation for Idaho Falls. On April 17, 2009, Fuhriman filed an answer in opposition arguing that, under this Court’s holding in City of Boise v. Frazier, 143 Idaho 1, 137 P.3d 388 (2006), the obligations incurred under the PSA lack the requisite urgency needed to be considered necessary. Following a hearing on May 7, 2009, the district court issued its order on June 15, 2009, holding that any obligations incurred pursuant to the PSA are ordinary and necessary.
On July 14, 2009, Fuhriman filed a timely notice of appeal pursuant to I.C. § 7-1309. On August 10, 2009, Idaho Falls filed a motion for expedited hearing pursuant to Idaho Appellate Rule 44, and this Court granted the motion on September 2, 2009.
II.STANDARD OF REVIEW
This Court aptly summarized the applicable standard of review in Frazier, as follows: “[t]his Court defers to the factual findings of the district court unless those findings are clearly erroneous. This Court exercises free review of the district court’s application of the relevant law to the facts. Constitutional issues are questions of law over which we also exercise free review.” 143 Idaho at 2, 137 P.3d at 389 (internal citations omitted).
III.ANALYSIS
Cities in Idaho are generally barred from incurring debts or liabilities, in excess of the income and revenue provided for debts and liabilities in such year, unless they first conduct an election and secure *577 voter approval of the proposed expenditure, as provided in Article VIII, § 3 of the Idaho Constitution.[5] Frazier, 143 Idaho at 2, 137 P.3d at 389. There is, however, one relevant exception known as the “proviso clause” wherein no public vote is required if the expenditures constitute “ordinary and necessary expense[s] authorized by the general laws of the state.” Id. at 3, 137 P.3d at 390 (quotation omitted).
Here, the district court initially expressed uncertainty as to whether the PSA should properly be considered as the incurring of an “indebtedness or liability” under the Idaho Constitution, as “a contract to buy power in the future is simply a promise to continue to pay for a municipal budgetary item in the future.” The district court nevertheless recognized that it is “within the realm of reason” that Idaho Falls is incurring a new liability by entering into the PSA,[6] so the court analyzed the PSA and CA. The district court found that the CA is merely a security agreement, imposing no additional indebtedness or liabilities on Idaho Falls, and found that the liability incurred under the PSA constitutes an ordinary and necessary expense under the proviso clause.
A. The Development of Article VIII, § 3 of the Idaho Constitution
In Frazier, this Court summarized the development of Article VIII, § 3 of the Idaho Constitution as follows:
*578 Article VIII, § 3 has been part of Idaho’s Constitution since the beginning of statehood. The draft version of Article VIII, § 3 that was submitted to the 1889 Idaho Constitutional Convention was modeled after and nearly identical to Article XI, § 18 of the California Constitution of 1879. See 1 PROCEEDINGS AND DEBATES OF THE CONSTITUTIONAL CONVENTION OF IDAHO 1889, 589 (1912) (henceforth 1 PROCEEDINGS); CAL. CONST. of 1879, Art. XI, § 18. The intention was to prevent local government entities from incurring debts without approval from the voters and a clear plan to retire those debts. DONALD CROWLEY & FLORENCE HEFFRON, THE IDA- [¶] STATE CONSTITUTION 170 (1994).
Broadly speaking, Article VIII, § 3 imposes two requirements to be met by local governments before incurring indebtedness. The first requirement is a public election securing two-thirds of the vote, and the second is the collection of an annual tax sufficient to pay the debt within thirty years. The remainder of the section consists of exceptions to those requirements, beginning with the previously mentioned proviso clause and continuing with language added in a series of subsequent amendments not applicable to our analysis.
When the draft version of Article VIII, § 3 was presented to the constitutional convention, it was amended by the delegates to add the words “provided, that this section shall not be construed to apply to the ordinary and necessary expenses authorized by the general laws of the state.” See IDAHO CONST. art. VIII, § 3; 1 PROCEEDINGS at 584-94. Delegate William Claggett offered the original proviso clause. See 1 PROCEEDINGS at 586. Claggett explained his intent to the other delegates, stating: “[w]e all know that in the practical administration of county government, that there sometimes will be extraordinary expenses, I mean extraordinary expenses in the ordinary administration of affairs.” Id. at 588. By way of example, Claggett mentioned the payment of witness fees. Id. Other delegates mentioned juror fees and criminal court expenses, id. at 590, the expense of controlling streams and ditches, id. at 592, and “any emergency” id. at 587.
143 Idaho at 3-4,137 P.3d at 390-91.
B. The liability incurred under the PSA is not “necessary” under the proviso clause of Article VIII, § 3 of the Idaho Constitution.
In Frazier, this Court considered whether the City of Boise could incur long-term indebtedness in financing an expansion of the City’s airport parking facilities without first submitting the project to a vote. 143 Idaho at 2, 137 P.3d at 389. This Court, in holding that the project did not fit within the proviso clause, wrote that “in order for an expenditure to qualify as ‘necessary’ under the proviso clause of Article VIII, § 3 there must exist a necessity for making the expenditure at or during such year.” 143 Idaho at 5, 137 P.3d at 392 (emphasis added). “The required urgency can result from a number of possible causes, such as threats to public safety, the need for repairs, maintenance, or preservation of existing property, or a legal obligation to make the expenditure without delay.” Id. at 6-7,137 P.3d at 393-94 (internal citations omitted).
Applying the Frazier analysis to the facts of this case, the liability that Idaho Falls is incurring under the PSA cannot reasonably be said to be “necessary” as there is no reason the liability had to be incurred in the year in which the contract was signed. The purchase of electricity under the PSA will not commence until October 1, 2011, and will continue for seventeen years thereafter. Clearly there was no urgency which required that the agreement be entered into “during such year” that it was entered into as ample time existed during which Idaho Falls could have submitted this proposed contract to its taxpayers for a confirmatory vote.
Idaho Falls makes the argument that Frazier is not properly read as imposing a bright-line rule that in order for an expenditure to be “necessary” it must be urgent, but this is inconsistent with the plain reading of Frazier. Idaho Falls urges this Court to distinguish Frazier and limit the necessity-requires-urgeney analysis to cases involving *579 large capital projects, such as the expansion of an airport parking garage, and not to apply the analysis to cases of extraordinary indebtedness or liabilities that arise in the ordinary administration of local government affairs, such as repairs, maintenance, city employees’ salaries, etc.[7]
In support of its argument, Idaho Falls cites statements made by Delegate William Claggett at Idaho’s Constitutional Convention when he was proposing the proviso clause, where he distinguished between extraordinary expenses that arise in the ordinary administration of affairs, and special indebtedness which does not. See I.W. Hart, Proceedings and Debates of the Constitutional Convention of Idaho, 588-89 (1912). Idaho Falls argues that Claggett’s statements indicate that Claggett, and the other framers of Idaho’s Constitution, intended for the proviso clause to make an exception for indebtedness and liabilities where the “character” of that debt can fairly be classified as “the type of debt that arises under the ordinary administration of local government affairs” whether or not an element of urgency is present.[8] Idaho Falls appears to advocate a “know it when we see it” factual inquiry for determining whether liabilities or indebtedness incurred by counties or municipalities are “ordinary and necessary.” We shall not stray from the principle of stare decisis without an exceptionally compelling reason to do so, particularly where doing so would be a move to embrace ambiguity over order.
It is also argued that Idaho Falls — acting through IFP — having chosen to provide electricity to their constituents, has an obligation to continue to provide sufficient electricity to meet them constituents’ needs. Assuming, arguendo, that this is true, this merely means that IFP’s expenditures to obtain adequate electricity for its customers on a short term basis is “necessary” under the proviso clause. In Bannock County v. C. Bunting & Co., this Court found Bannock County’s expenditures for the provision of a temporary jail were ordinary and necessary. 4 Idaho 156, 37 P. 277 (1894) overruled in part on other grounds by Veatch v. City of Moscow, 18 Idaho 313, 109 P. 722 (1910). However, we went on to clarify that, although Bannock County was obligated to provide a facility to act as a jail, “such rooms must be temporarily provided, at as little expense as is consistent with providing suitable quarters, until the question can be submitted to the people.” Id. at 168, 37 P. at 281. In accordance with this reasoning Idaho Falls must obtain electricity on a temporary basis unless and until a long-term agreement is confirmed by two-thirds of its qualified electors.
Idaho Falls argues that purchasing power on an annual, or monthly, basis would subject the City to significant market risk and price volatility. This is likely true; however, this does not mean that Idaho Falls may incur a long-term liability for a short term need, absent a confirmatory vote. As this Court stated in Frazier:
The Idaho Constitution is imbued with the spirit of economy, and in so far as possible it imposes upon the political subdivisions of the state a pay-as-you-go system of finance. The rule is that, without the express assent of the qualified electors, municipal officers are not to incur debts for which they have not the funds to pay. *580 Such policy entails a measure of crudity and inefficiency in local government, but doubtless the men who drafted the Constitution, having in mind disastrous examples of optimism and extravagance on the part of public officials, thought best to sacrifice a measure of efficiency for a degree of safety. The careful, thrifty citizen sometimes gets along with a crude instrumentality until he is able to purchase and pay for something better. And likewise, under the Constitution, county officers must use the means they have for making fair and equitable assessments until they are able to pay for something more efficient or obtain the consent of those in whose interests they are supposed to act.
143 Idaho at 5, 137 P.3d at 392 (quoting Williams v. City of Emmett, 51 Idaho 500, 505, 6 P.2d 475, 476 (1931)). If the purchase price of electricity under the PSA is preferable to the rates, factoring in potential market volatility, available under short term contracts it is all the more likely that the qualified electors would vote to confirm the PSA.
Therefore, we hold that, under our precedent in Frazier, the PSA is not “necessary” under the meaning of Article VIII, § 3 of the Idaho Constitution, and does not fit within the proviso clause.
IV. CONCLUSION
We hold that the PSA constitutes a liability exceeding the income and revenue provided for it in the year in which it was incurred, did not receive the assent of two-thirds of the qualified voting electorate, and did not fit into the exception to this requirement under the proviso clause. Therefore, we reverse the district court’s confirmation of the validity of the PSA.
Chief Justice EISMANN and Justice HORTON concur.

. Fuhriman has standing to file suit as an elector and taxpayer residing in the city of Idaho Falls. See Koch v. Canyon County, 145 Idaho 158, 163, 177 P.3d 372, 377 (2008).

. Fuhriman challenges only the district court's finding that the PSA constitutes a "necessary” expense, therefore we offer no opinion as to whether the expense was “ordinary.”

. With the "Slice” product, Idaho Falls will purchase a specified percentage of the output of the Federal Power System. This percentage will be formally established prior to the beginning of power deliveries and is subject to adjustment from time to time pursuant to the provisions of the PSA. The amount of power made available to Idaho Falls under the "Slice” product will vary with the actual generating output of the Federal Power System. Section 5.1 of the PSA provides that the "Slice” product is a power sale and under no circumstances shall be construed as a sale of the resources or capability of the Federal Power System.

.With the "Block” product, Idaho Falls will purchase specified amounts of power each month. The amounts of power will vary by month to reflect seasonal variations in the power requirements of the customers served by the System. The specific amount of "Block” power to be purchased by Idaho Falls will be formally established prior to the beginning of power deliveries and will remain fixed for the term of the PSA.

. Article VIII, § 3 of the Idaho Constitution is titled ''Limitations on county and municipal indebtedness,” and states:
No county, city, board of education, or school district, or other subdivision of the state, shall incur any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year, the income and revenue provided for it for such year, without the assent of two-thirds of the qualified electors thereof voting at an election to be held for that purpose, nor unless, before or at the time of incurring such indebtedness, provisions shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof, within thirty years from the time of contracting the same. Any indebtedness or liability incurred contrary to this provision shall be void: Provided, that this section shall not be construed to apply to the ordinary and necessary expenses authorized by the general laws of the state and provided further that any city may own, purchase, construct, extend, or equip, within and without the corporate limits of such city, off street parking facilities, public recreation facilities, and air navigation facilities, and, for the purpose of paying the cost thereof may, without regard to any limitation herein imposed, with the assent of two-thirds of the qualified electors voting at an election to be held for that purpose, issue revenue bonds therefor, the principal and interest of which to be paid solely from revenue derived from rates and charges for the use of, and the service rendered by, such facilities as may be prescribed by law, and provided further, that any city or other political subdivision of the state may own, purchase, construct, extend, or equip, within and without the corporate limits of such city or political subdivision, water system, sewage collection systems, water treatment plants, sewage treatment plants, and may rehabilitate existing electrical generating facilities, and for the purpose of paying the cost thereof, may, without regard to any limitation herein imposed, with the assent of a majority of the qualified electors voting at an election to be held for that purpose, issue revenue bonds therefor, the principal and interest of which to be paid solely from revenue derived from rates and charges for the use of, and the service rendered by such systems, plants and facilities, as may be prescribed by law; and provided further that any port district, for the purpose of carrying into effect all or any of the powers now or hereafter granted to port districts by the laws of this state, may contract indebtedness and issue revenue bonds evidencing such indebtedness, without the necessity of the voters of the port district authorizing the same, such revenue bonds to be payable solely from all or such part of the revenues of the port district derived from any source whatsoever excepting only those revenues derived from ad valorem taxes, as the port commission thereof may determine, and such revenue bonds not to be in any manner or to any extent a general obligation of the port district issuing the same, nor a charge upon the ad valorem tax revenue of such port district.
(Emphasis added).

. Indeed, under this Court's precedent it is clear that Idaho Falls is incurring a liability under the PSA. See Hanson v. City of Idaho Falls, 92 Idaho 512, 514, 446 P.2d 634, 636 (1968); Fell v. City of Coeur d’Alene, 23 Idaho 32, 49-50, 129 P. 643, 648-49 (1912); Boise Dev. Co. v. City of Boise, 26 Idaho 347, 359-361, 143 P. 531, 534-35 (1914). Even if the PSA is classified as a "pay-as-you-go” contract for services rendered, as it requires monthly payments for the electricity provided in the preceding month, it is still an incurred liability in that Idaho Falls will be obligated to pay under the contract regardless of whether funds are allocated under the city budget to pay for it.

. As noted above, in Frazier this Court recognized that repairs and maintenance satisfy the urgency requirement as they are related to public safety.

. In arguing for this distinction, Idaho Falls writes: "Perceptive observers then and now have recognized that presenting every issue of multi-year municipal debt to the voters would be impractical and completely unworkable.” In support of this contention, Idaho Falls cites to Justice J. Jones’s special concurrence in In re University Place/Idaho Water Center Project, 146 Idaho 527, 547, 199 P.3d 102, 122 (2008) (J. Jones, J., specially concurring), where he wrote that "[i]t is a virtual impossibility to present every multi-year governmental contract or lease to the public for a vote.” Interestingly enough, when that statement is placed in context it is apparent that Justice Jones was not arguing that multi-year contracts are not subject to voting requirements under Article VIII, § 3, or that multiyear debts or liabilities may be incurred under these contracts in the absence of urgency; on the contrary, he was explaining why "leases and other contracts that are intended to extend beyond one year always contain provisions (1) making the government’s performance subject to availability of appropriated funds and (2) making the agreement renewable on an annual basis for the contemplated term.” Id.