SUBSTITUTE OPINION, THE COURT’S PRIOR OPINION DATED AUGUST 20, 2015 IS HEREBY WITHDRAWN.
HORTON, Justice.
This appeal from Custer County relates to proposed repairs and improvements to the City of Challis’ (the City) water distribution system. In 2013, the City initiated a judicial confirmation proceeding seeking approval to incur $3.2 million in debt without a public vote. The Consent of the Governed Caucus (the Caucus) challenged the constitutionality of the City’s request based upon Article VIII, section 3 of the Idaho Constitution. The district court granted the City’s request and the Caucus appealed. We reverse.
I. FACTUAL AND PROCEDURAL BACKGROUND
The City maintains a drinking water distribution system. In December of 2011, the City commissioned the services of Riedesel Engineering to determine the present and future adequacy of the system with respect to laws and standards of the local fire authority, the Idaho Department of Environmental Quality (DEQ), and the United States Environmental Protection Agency. Riedesel Engineering issued its Challis Water System Facility Plan (the Riedesel Report) in February of 2012, outlining aspects of the water system that needed repair and improvement.
The City initiated this action on August 29, 2013, under Idaho’s Judicial Confirmation Law, Idaho Code sections 7-1301, et seq. The City sought approval to incur $3.2 million in public indebtedness without a public vote for work on the City’s water distribution system. On October 1, 2013, the Caucus appeared and challenged whether the indebtedness was “necessary” under the Idaho Constitution. An evidentiary hearing was held on January 17, 2014. At the hearing, the City presented testimony from its Mayor, Superintendent of Public Works, and Engineer. The Caucus presented testimony from an engineer it had retained.
Three components comprised the proposed work on the City’s water system: (1) replace *400 ment of meters and installation of a new telemetry system, (2) construction of a new pipeline to the airport, and (3) replacement of aging pipes and fire hydrants in “Old Town.”[1]
The metering and telemetry work calls for aging meters to be replaced with automatic meters and the system supervisory control and data acquisition (SCADA) system to be upgraded. Although the current metering and telemetry system is operational, the Riedesel Report identifies several advantages to the proposal. Replacement of the metering system will allow for accurate, year-round determination of water use, permit identification of service leaks, enable recovery of “lost water revenues,” and encourage conservation. Installation of a new telemetry system will reduce staff time and improve monitoring capabilities, resulting in enhanced responsiveness to alarms and increased system security.
The airport component of the work calls for extending new six and eight inch mains, along with fire hydrants, to the airport. The airport is not currently tied into the City’s water system, relying instead on an independent system supplied with well water. The Riedesel Report reflects that the primary deficiency of the current airport water system is inadequate water flow to meet design fire requirements. This has resulted in increased fire insurance premiums and concern about the potential negative impact on the City’s economic attractiveness to businesses which may be considering locating operations within the City.
The Old Town work includes replacing old four inch pipes with larger water mains, installing new fire hydrants, looping dead end pipes, installing pressure reduction stations, and making roadway improvements. Although Old Town’s water system is currently operational, the outdated system is subject to water main breakage and increased capacity is needed for fire protection purposes. Portions of the Old Town system do not meet current standards imposed by DEQ regula-tions. However, these regulations also provide that the City is not required to comply with these standards until new construction on the system takes place. In other words, the Old Town system is “grandfathered.”
On February 5, 2014, the district court issued its Findings of Fact and Conclusions of Law, holding that the City could incur debt to finance the project without a confirmatory vote of the electorate. The district court entered judgment on March 19, 2014, and the Caucus timely appealed.
II. STANDARD OF REVIEW
“This Court defers to the factual findings of the district court unless those findings are clearly erroneous. This Court exercises free review of the district court’s application of the relevant law to the facts. Constitutional issues are questions of law over which we also exercise free review.” City of Idaho Falls v. Fuhriman, 149 Idaho 574, 576, 237 P.3d 1200, 1202 (2010) (quoting City of Boise v. Frazier, 143 Idaho 1, 2, 137 P.3d 388, 389 (2006)).
III. ANALYSIS
The Caucus’ appeal asserts that Article VIII, section 3 of the Idaho Constitution forbids the City from incurring this debt without a confirmatory vote and that the district court’s findings were clearly erroneous. We begin by considering the current status of our jurisprudence relating to this provision of the Idaho Constitution.
A. An overview of recent case law regarding Article VIII, section 3 of the Idaho Constitution.
“Cities in Idaho are generally barred from incurring debts or liabilities, in excess of the income and revenue provided for debts and liabilities in such year, unless they first conduct an election and secure voter approval of the proposed expenditure, as provided in Article VIII, § 3 of the Idaho Constitution.” Fuhriman, 149 Idaho at 576-77, 237 P.3d at 1202-03. This constitutional provision contains an exception, known as the proviso clause, that no voter approval is re- *401 quired if the expenditure is for “ordinary and necessary expenses authorized by the general laws of the state.... ” Idaho Const, art. VIII, § 3. The words “ordinary” and “necessary” are “read in the conjunctive.”[2] Frazier, 143 Idaho at 4, 137 P.3d at 391.
In Frazier, this Court summarized the circumstances surrounding adoption of Article VIII, section 3 of Idaho’s Constitution:
Article VIII, § 3 has been part of Idaho’s Constitution since the beginning of statehood. The draft version of Article VIII, § 3 that was submitted to the 1889 Idaho Constitutional Convention was modeled after and nearly identical to Article XI, § 18 of the California Constitution of 1879. See 1 Proceedings and Debates of the Constitutional Convention of Idaho 1889, 589 (1912) (henceforth 1 Proceedings); Cal. Const, of 1879, Art. XI, § 18. The intention was to prevent local government entities from incurring debts without approval from the voters and a clear plan to retire those debts. Donald Crowley & Florence Heffron, The Idaho State Constitution 170 (1994).
Broadly speaking, Article VIII, § 3 imposes two requirements to be met by local governments before incurring indebtedness. The first requirement is a public election securing two-thirds of the vote, and the second is the collection of an annual tax sufficient to pay the debt within thirty years. The remainder of the section consists of exceptions to those requirements, beginning with the previously mentioned proviso clause and continuing with language added in a series of subsequent amendments not applicable to our analysis.
When the draft version of Article VIII, § 3 was presented to the constitutional convention, it was amended by the delegates to add the words “provided, that this section shall not be construed to apply to the ordinary and necessary expenses authorized by the general laws of the state.” See Idaho Const, art. VIII, § 3; 1 Proceedings at 584-94. Delegate William Claggett offered the original proviso clause. See 1 Proceedings at 586. Claggett explained his intent to the other delegates, stating: “[w]e all know that in the practical administration of county government, that there sometimes will be extraordinary expenses, I mean extraordinary expenses in the ordinary administration of affairs.” Id. at 588. By way of example, Claggett mentioned the payment of witness fees. Id. Other delegates mentioned juror fees and criminal court expenses, id. at 590, the expense of controlling streams and ditches, id. at 592, and “any emergency” id. at 587.
Frazier, 143 Idaho at 3-4, 137 P.3d at 390-91.
Originally this Court interpreted the proviso clause “very narrowly,” but as time went on this Court “interpreted the ‘ordinary and necessary’ language more broadly.” Asson v. City of Burley, 105 Idaho 432, 441-42, 670 P.2d 839, 848-49 (1983). However, this Court returned to the proviso clause’s original, narrow interpretation in Frazier and decided the case using a “bright-line rule” originally used in Dunbar v. Bd. of Comm’rs of Canyon Cnty., 5 Idaho 407, 412, 49 P. 409, 411 (1897). Fuhriman, 149 Idaho at 578, 237 P.3d at 1204; Frazier, 143 Idaho at 4, 137 P.3d at 391. This bright-line rule provides that “in order for an expenditure to qualify as ‘necessary’ under the proviso clause of Article VIII, § 3 there must exist a necessity for making the expenditure at or during such year.” Id. (emphasis original) (quoting Frazier, 143 Idaho at 4, 137 P.3d at 391). “The required urgency can result from a number of possible causes, such as threats to public safety, the need for repairs, maintenance, or preservation of existing property, or a legal obligation to make the expenditure without delay.” Fuhriman, 149 Idaho at 578, 237 P.3d at 1204 (quoting Frazier, 143 Idaho at 6-7, 137 P.3d at 393-94). This Court reasoned that this rule aligns:
closely with the types of expenditures the delegates at the Idaho Constitutional Convention discussed when they debated Article VIII, § 3 of our state constitution. Those expenditures included unavoidable expenses, such as carrying on criminal trials and abating flood damage, that could *402 not be delayed. We observe that the expenditures contemplated by the delegates involved immediate or emergency expenses, such as those involving public safety, or expenses the government entity in question was legally obligated to perform promptly.
Frazier, 143 Idaho at 4, 137 P.3d at 391 (citation omitted).
B. The district court erred by failing to apply the legal standard for determination of what constitutes a “necessary” expense under Article VIII, section 3 of the Idaho Constitution as articulated in Fuhriman and Frazier.
The district court did not discuss our decisions in Frazier and Fuhriman as to what constitutes a necessary expense.[3] Instead, the district court held that the expenditure need not be “urgent,” stating:
an expense can be necessary without an immediate “urgency” or emergency if the repair is necessary for the good of the public health and safety. This Court finds that the proposed repairs do not need to be “urgent” in the sense that Respondents argue, but instead the repairs must be necessary Under the meaning of the Idaho Constitution.
This statement is inconsistent with the legal principles articulated in Fuhriman and Frazier. In both cases, we repeatedly referred to the “urgency” of a necessary expense for which indebtedness may be incurred without an approving vote of the electorate. Fuhriman, 149 Idaho at 578-79, 237 P.3d at 1204-05; Frazier, 143 Idaho at 6, 137 P.3d at 393.
The Caucus argues the district court erred by failing to apply the principles articulated in these decisions, contending that there must be a necessity for making the expenditure during the year at issue. The City responds that the Caucus’ “absolutist interpretation” ignores (1) the repair and maintenance and (2) public safety exceptions to Article VIII, section 3 of the Idaho Constitution, which apply without temporal limitation.
This Court has previously addressed the first exception claimed by the City. In Fuhriman, we expressly rejected the municipality’s contention that expenses arising “in the ordinary administration of local government affairs, such as repairs [and] maintenance” are exempt from the “necessity-requires-urgency analysis.” Fuhriman, 149 Idaho at 578-79, 237 P.3d at 1204-05. There, Idaho Falls sought to incur a long-term liability under a power sales agreement for the benefit of its municipal electric utility. Id. at 575-76, 237 P.3d at 1201-02. We held that the “necessity-requires-urgency” analysis applied and the “exception” advocated by Idaho Falls did not apply, stating:
Idaho Falls appears to advocate a “know it when we see it” factual inquiry for determining whether liabilities or indebtedness incurred by counties or municipalities are “ordinary and necessary.” We shall not stray from the principle of stare decisis without an exceptionally compelling reason to do so, particularly where doing so would be a move to embrace ambiguity over order.
Id. at 579, 237 P.3d at 1205. The Court reasoned that Idaho Falls could continue to provide power through short-term, albeit more expensive, agreements while it came up with a more lasting solution subject to a confirmatory vote. Id.
This Court has not explicitly addressed the question whether the “necessity-requires-urgency” analysis applies in instances where public safety is implicated. The City correctly observes that our past decisions have taken an expansive view of public safety considerations when evaluating whether expenditures were ordinary and necessary. See City of Pocatello v. Peterson, 93 Idaho 774, 778, 473 P.2d 644, 648 (1970) (replacement of an “inadequate” and “unsound” airport terminal held to be a “necessary” expense); Bd. of Cnty. Comm’rs of Twin Falls Cnty. v. Idaho Health Facilities Auth., 96 Idaho 498, 510, 531 P.2d 588, 600 (1974) (holding that improvements to hospital structure in order to comply with state safety standards was an *403 “ordinary and necessary” expense). Frazier did not overrule these earlier decisions, choosing instead to characterize them as “broadly consistent” with the Dunbar rule. Frazier, 143 Idaho at 4, 137 P.3d at 391.
We take this opportunity to reiterate our holding in Frazier and Fuhriman. The “neeessity-requires-urgeney” analysis governs all expenditures, regardless of the underlying purpose. In Fuhriman, when discussing this analysis, we quoted from Frazier, observing that “[t]he required urgency can result from a number of possible causes, such as threats to public safety, the need for repairs, maintenance, or preservation of existing property, or a legal obligation to make the expenditure without delay.” Fuhriman, 149 Idaho at 578, 237 P.3d at 1204 (quoting Frazier, 143 Idaho at 6-7, 137 P.3d at 393-94). For these reasons, we conclude that the district court erred by failing to apply the legal analysis articulated in Fuhriman and Frazier when considering whether the City’s proposal constituted a “necessary” expense under the Idaho Constitution.
C. This Court must consider the project as a whole.
The parties concur on one point of law: a court is without power to partially grant judicial confirmation of a bond, obligation, or agreement. We agree that courts lack the authority to approve some aspects of a proposal while rejecting others. Idaho Code section 7-1308(2) charges the district court with the responsibility of determining “if the political subdivision is entitled to the relief sought.” Nothing within the Judicial Confirmation Law may be interpreted as granting the district court authority analogous to a line-item veto. Here, the City’s petition asked the district court to confirm “whether or not the proposed promissory note or other obligation evidencing” $3.2 million in debt “constitutes an ‘ordinary and necessary expense.’ ”
D. The district court erred in finding the project to be “necessary” under the test provided in Fuhriman, Frazier, and Dunbar.
We must now determine whether the proposed project is “necessary.” As previously noted, the proposed project has three components, (1) the meter and telemetry upgrades, (2) the airport expansion, and (3) the Old Town water line replacement.
The district court determined the metering upgrades were necessary for accurate billing and water conservation. It also determined the telemetry upgrades were “necessary” “to provide security to the system.” The Caucus argues installing “new high-tech metering and telemetry” is not truly urgent because the City discussed the project for four years and there is already a workable metering system. The City responds that telemetry upgrades are necessary to prevent unauthorized entry to facilities and potential threats to the water distribution system. It further argues meter replacement is necessary for water conservation and equitably charging users for the amount of water they actually consume.
In Fuhriman, we discussed our earlier decision in Bannock Cnty. v. C. Bunting & Co., 4 Idaho 156, 37 P. 277 (1894) overruled on other grounds by Veatch v. City of Moscow, 18 Idaho 313, 109 P. 722 (1910), stating:
In Bannock County v. C. Bunting & Co., this Court found Bannock County’s expenditures for the provision of a temporary jail were ordinary and necessary. 4 Idaho 156, 37 P. 277 (1894) overruled in part on other grounds by Veatch v. City of Moscow, 18 Idaho 313, 109 P. 722 (1910). However, we went on to clarify that, although Bannock County was obligated to provide a facility to act as a jail, “such rooms must be temporarily provided, at as little expense as is consistent with providing suitable quarters, until the question can be submitted to the people.” Id. at 168, 37 P. at 281. In accordance with this reasoning Idaho Falls must obtain electricity on a temporary basis unless and until a long-term agreement is confirmed by two-thirds of its qualified electors.
149 Idaho at 579, 237 P.3d at 1205. Additionally, we quoted Frazier1 s discussion of the thrifty inclinations of the framers of the Idaho Constitution:
*404 The Idaho Constitution is imbued with the spirit of economy, and in so far as possible it imposes upon the political subdivisions of the state a pay-as-you-go system of finance. The rule is that, without the express assent of the qualified electors, municipal officers are not to incur debts for which they have not the funds to pay. Such policy entails a measure of crudity and inefficiency in local government, but doubtless the men who drafted the Constitution, having in mind disastrous examples of optimism and extravagance on the part of public officials, thought best to sacrifice a measure of efficiency for a degree of safety. The careful, thrifty citizen sometimes gets along with a crude instrumentality until he is able to purchase and pay for something better. And likewise, under the Constitution, county officers must use the means they have for making fair and equitable assessments until they are able to pay for something more efficient or obtain the consent of those in whose interests they are supposed to act.
Id. at 579-80, 237 P.3d at 1205-06 (quoting Frazier, 143 Idaho at 5, 137 P.3d at 392).
Here, the Riedesel Report indicates the proposed metering and telemetry projects are largely motivated by economic interests. It stated: “Even though metering is not a health and safety priority, our analysis indicates the construction cost may be significantly (if not completely) offset by the labor saving to read the meters and process water bills.” Regarding telemetry it stated:
The City of Challis currently has minimal telemetry/supervisory control and data acquisition (SCADA) capability, and relies on visual inspections and site visits to monitor operation of its pumps and water storage elements. A more robust SCADA system will reduce staff time, improve overall monitoring of key elements, enhance reporting and response of alarm conditions, and improve the security of the system.
The testimony of Donald Acheson, the City Engineer, also supports these conclusions. He testified that meter replacement was necessary for water conservation and for “equitably distributing” the cost of water use. He also testified that the meters in the City were from the 1980s, were beyond a meter’s typical life-span, and were inefficient. Regarding telemetry, Acheson testified the telemetry improvements would promote public safety.
Applying the relevant law to these facts, we cannot say that the proposed metering and telemetry upgrades are necessary. As with the proposed long-term power agreement in Fuhriman, metering and telemetry upgrades are undoubtedly desirable from an economic perspective. However, the need for these upgrades cannot be characterized as urgent. As with the temporary jail in Bannock County the City must get by with what it has until it obtains approval for these expenditures from the electorate.
The City also argues that “[t]here is no Idaho precedent wherein this Court parceled out individual aspects of a project” and compares this Court’s concerns about the expense of metering and telemetry to questioning whether an “additional bathroom facility should or should not be included.” We do not agree. The estimated construction costs of aspects of the project are as follows:
[[Image here]]
At $645,036 the metering and telemetry upgrades constitute over 30% of the total estimated construction costs. We are unable to conclude that metering and telemetry is just a small portion of the project that we may overlook.
*405 The metering and telemetry upgrades cannot be characterized as “necessary.” Because this portion of the project is not necessary from a constitutional perspective, the district court erred in granting the petition for judicial confirmation. In light of this conclusion, we need not consider the parties’ arguments regarding the necessity of the airport extension and replacement of water lines in Old Town.
E. We award the Caucus attorney fees under Idaho Code section 7-1313.
Both parties request attorney fees. Since the City is not the prevailing party, it is not entitled to an award of attorney fees. The Caucus requests attorney fees on appeal and for the proceedings before the district court under Idaho Code section 7-1313. This statute provides:
Whenever a court shall determine that a political subdivision is not entitled to the relief sought or that this chapter has not been substantially complied with and enters a judgment denying the petition, the court shall award reasonable attorney fees to any owner of property, taxpayer, qualified elector or rate payor or any other interested person who has appeared and moved to dismiss or answer the petition.
In Frazier, 143 Idaho at 7, 137 P.3d at 394, we awarded attorney fees and remanded “to the district court pursuant to I.C. § 7-1313 and I.R.C.P. 54 for a determination of costs and a reasonable sum of attorney fees below and on appeal” after a party challenging Boise’s plan to build an airport parking garage prevailed on appeal. As the statute is mandatory, the Caucus is entitled to an award of attorney fees incurred in the prior proceedings and in this appeal. However, we erred in one procedural aspect in Frazier. It is not the district court’s responsibility to determine an appropriate award of fees and costs incurred on appeal; rather, that is our duty. Accordingly, this matter will be remanded to the district court with directions to ascertain and award the Caucus reasonable attorney fees and costs incurred in the prior proceedings in the district court. In the event that the Caucus timely submits a memorandum of costs and fees, see Rules 40(c) and 41(d), I.A.R., this Court will evaluate that memorandum, and any objections thereto, to determine an appropriate award of attorney fees and costs.
IV. CONCLUSION
We reverse the district court’s judgment granting judicial confirmation of the City’s proposed $3.2 million indebtedness for expenses related to repair and improvement of its water distribution system. This case is remanded to the district court with directions to ascertain and award the Caucus reasonable attorney fees and costs incurred in the proceedings below. We award attorney fees and costs on appeal to the Caucus.
Justices EISMANN and W. JONES concur.

. The City has two water storage and distribution systems: Old Town and Cyprus. Old Town is the original water distribution system and Cyprus the newer, having been constructed in the 1980s.

. The parties to this appeal agree that the proposed project is an "ordinary" expense. Thus, this opinion will focus on whether the proposed expenditure is "necessary.”

. The district court did cite to Frazier on one occasion. However, this citation related to the definition of "ordinary” for purposes of Article VIII, section 3. As noted, there is no dispute that the proposed project would be an ordinary expense.