J. JONES, Chief Justice,
dissenting.
I dissent because I am unable to agree with the Court’s conclusion that Article VIII, section 3 of the Idaho Constitution requires a vote of the people for the maintenance or modernization of an existing city water system. The framers of the Idaho Constitution were thrifty people, concerned about the possibility of county and city governments incurring unnecessary debt, but they were also practical people who looked to the future. They hoped and expected that cities in Idaho would grow, that municipal services for those cities would necessarily expand, and that such services would require periodic updating. And, they did not want to place unnecessary fiscal restraints upon county and municipal governments. This is reflected in the proceedings of the constitutional convention relating to Article VIII.
As originally proposed, section 3 would have required a two-thirds vote of qualified electors for any indebtedness exceeding the income and revenue of the governmental entity for the current year. The convention president, Judge William Claggett from Shoshone County, proposed the proviso clause out of concern that, without it, Article VIII, section 3, “would prohibit the issuance of county scrip to pay the ordinary indebtedness absolutely imposed upon the county as provided by law, in case there should be any *406 heavy expenses ... exceeding the current revenues of that year.” He observed that Article III, section 3 was “intended to apply to special indebtedness.” 1 PROCEEDINGS AND DEBATES OF THE CONSTITUTIONAL CONVENTION OF IDAHO 1889, 587 (1912) (hereafter 1 Proceedings). In support of the amendment adding the proviso clause, Judge Claggett argued:
We all know that in the practical administration of county government, that there sometimes will be extraordinary expenses, I mean extraordinary expenses in the ordinary administration of affairs. I am not speaking now of special indebtedness at all, but the ordinary general indebtedness which is incurred in the way of administration of county affairs.... [T]he object of the proviso ... is to limit [section 3] to such indebtedness as does not arise under the ordinary administration of the county.
1 Proceedings at 58889.
W.B. Heyburn from Shoshone County argued in favor of the proviso clause, pointing out that it was expensive and impractical to require an election every time a county incurred indebtedness in excess of current year revenues. He said, “[W]e don’t want to leave any part of the ordinary legitimate expenses of running county government in doubt, and we don’t want to call a county election for the purpose of making up a deficit of four or five hundred dollars at the end of the year, because the costs of the election are very considerable in a county such as ours.” 1 Proceedings at 591.
H.S. Hampton from Cassia County offered a substitute for the proviso clause, limiting it to “necessary court expenses.” 1 Proceedings at 59192. P.J. Pefley from Ada County opposed the substitute, arguing:
It occurs to me if that motion should prevail it would cut cities off. Now we are liable to fall short in our ordinary levy in this city. We have streams running adjacent through the city that in time of high water, and ditches all the time, that are liable as I said to break away and run down through the city, and if we had to wait to hold an election and get two-thirds of the voters to ratify another levy, the whole city might be ruined before it could be abated, and I would not like to see anything of that kind occur. I think it should apply to cities and counties alike and all corporations, that they should be allowed in contingencies to abate them immediately without waiting for an election to be ratified by two-thirds.
1 Proceedings at 592. The substitute amendment was rejected and the proviso clause was adopted by the convention.
The convention then turned to consideration of a proposed section 4 to Article VIII, which apparently limited the indebtedness authorized to be incurred by governmental subdivisions to five percent on the assessed value of their property. 1 Proceedings at 598. Substantial objections were made to the proposed limitation. The debate on section 4 is relevant here, as it sheds light on the intent of the delegates as to the proviso clause upon which they had just acted.
W.B. Heyburn moved to strike section 4, saying,
if it is not stricken out, as far as the members of this convention from Shoshone county are concerned, they can just go home, because they will have no interest in the state government whatever. It will completely fence them in, either with the amendment or as it was originally reported---- The wheels of their government will be stopped, whenever you adopt that section, right there____We have a government that must be kept in motion.
1 Proceedings at 599600. J.W. Poe from Nez Perce County agreed, arguing:
I heartily support the motion of the gentleman from Shoshone, Mr. Heyburn. I don’t think these city corporations or town corporations ought to be circumscribed as to the powers of appropriation or indebtedness they may create. They are the parties who will have to suffer the consequences of any unnecessary schemes there may be that are abetted by reason of an appropriation for any amount which may be excessive____ I heartily support the motion to take that section out of the constitution, and leave the cities the opportunity if they see proper, to make appropriations for sewerage, sanitary purposes, *407 or any other thing which in their judgment they may believe will inure to the advantage of their city or town or to their county. Leave it to them.
1 Proceedings at 60001.
Edgar Wilson from Ada County argued, “[I]f the section does prevail it paralyzes different improvements in this city and will ruin municipal improvements in half a dozen towns in Idaho Territory.” 1 Proceedings at 601. W.C.B. Allen from Logan County said, “I think it is limiting the powers of the state in such respects as would prevent its prosperity and progress and prevent it from issuing bonds for carrying on public work.” 1 Proceedings at 602. Section 4 was stricken by the convention.
None of the delegates indicated that there must be a great sense of urgency in the present year for a governmental subdivision to incur indebtedness exceeding revenues or income in order to repair or improve existing infrastructure. Mr. Pefley clearly indicated that he understood the proviso clause to allow debt to be incurred in order to make improvements to a city’s existing ditch system before damage was incurred. He did not indicate that the potential damage had to be of an immediate nature. Again, these people were practical and knew that once you established a ditch system, a fire department, a municipal water distribution system, or some other public facility authorized by law, maintenance and modernization were necessary to keep the facility in good operating condition. They intended Idaho cities to expand and did not express any notion that each time an improvement was necessary, an election would be required.
The urgency expressed in Dunbar v. Bd. of Comm’rs of Canyon Cnty., 5 Idaho 407, 412, 49 P. 409, 411 (1897), where the Court said, “there must exist a necessity for making the expenditure at or during such year,” is unsupported by any argument made by the delegates at the convention. Indeed, the comment was unnecessary to the Court’s decision because Dunbar was decided on the ordinary prong of the proviso clause, rather than the necessary prong. The Court’s holding said:
We conclude that the building of a bridge and the payment of scalp bounties are not ordinary, but extraordinary, expenses, and, being such, cannot be created in excess of the revenue for the fiscal year in which they may be incurred without the assent of two-thirds of the electors of the county voting at an election duly called and held.
Id. The holding did not address the necessity issue. The holding was, however, contrary to Judge Claggett’s admonishment that the proviso was not intended to prohibit “extraordinary expenses in the ordinary administration of affairs.” 1 Proceedings at 588. He specifically stated that what the proviso clause did not countenance was “special indebtedness.” Further, the two expenditures at issue in the Dunbar case were for new items — a new bridge and a new scalp bounty — rather than for continuation of existing programs or expenditures.
Of interest is the fact that the Court did not even acknowledge the Dunbar holding in a case decided just 15 years later, pertaining to the repair and improvement of a city water system. In Hickey v. City of Nampa, 22 Idaho 41, 124 P. 280 (1912), the Court was considering whether planned expenditures to repair and improve the water system of the City of Nampa required the vote of the city’s qualified electors under Art. VIII, section 3. The system had sustained fire damage. The Court held that a vote was unnecessary, saying:
The city of Nampa had duly and regularly exercised the power and authority conferred upon it by the provisions of subdivisions 36 and 37 of section 2238, Rev. Codes, in acquiring and maintaining a waterworks system and apparatus and appliances for extinguishing fires. In order for this property to be of any value to the city, it was necessary for it to be kept in repair. When the fire came and the waterworks system was impaired and rendered useless, it was necessary that the city repair and restore it. It was also equally necessary to have fire equipment and apparatus to enable it to properly utilize the water in case of fire.... It appears in this case that the mayor and city council acted in good faith, and that this was a bona fide im *408 provement and restoration of property, within the purview and meaning of the statute.
The city council could certainly not use this as a subterfuge for the construction or purchase of a new system of waterworks or other independent, separate, or new property, so as to contravene the provisions of section 3, art. 8, of the Constitution____We take it that it was within the power of the Legislature, under [Article VIII, section 3] to say that an expenditure, though out of the ordinary, which is incurred for the purpose of repairing some damage done to city property, or improving it in such manner as to render it serviceable to the city, falls within this proviso to the Constitution. The repair and improvement of the property may be “ordinary and necessary,” and yet not occur frequently. It is one of the incidents of the ownership of property that it must be kept in repair ...
22 Idaho at 44-45, 124 P. at 281. (underlined emphasis added). The Court made no mention of the Dunbar dicta that “there must exist a necessity for making the expenditure at or during such year.”
Notwithstanding that the urgency language in Dunbar appears to have been unnecessary to the decision in that case and unsupported by any debate at the constitution convention, it was cited to and given legs in City of Boise v. Frazier, 143 Idaho 1, 4, 137 P.3d 388, 391 (2006). It then was given additional credibility in City of Idaho Falls v. Fuhriman, 149 Idaho 574, 578, 237 P.3d 1200, 1204 (2010). With this shaky foundation, it also makes its way into the Court’s present opinion. It is inconsistent with the constitutional convention debate and should be disregarded.
The main focus of the inquiry should be directed to the issue of whether the governmental entity proposes a new program or facility or whether the proposed expenditure is for an existing program or repair or modernization of an existing facility. That was, in fact, the issue decided by the Court in both Dunbar and Frazier. In Dunbar, the question was whether a new bridge could be built without a vote of the electors where the cost would exceed the current year’s income. In Frazier, the question was whether “[converting a flat parking lot into a five floor parking garage,” an expansion “so profound as to constitute an entirely new construction” was “necessary” within the meaning of the proviso clause. Id. at 6, 137 P.3d at 393.
It is true that the Court has zigged and zagged over the years as to the scope of the proviso clause, sometimes giving it a broader reading and at other times a narrower reading. This is reflected in the Court’s discussion of previous decisions in Asson v. City of Burley, 105 Idaho 432, 441-42, 670 P.2d 839, 848-49 (1983), and of cases discussed in the various opinions in Frazier and Fuhriman. Nevertheless, what has been fairly consistent is the recognition of a dichotomy between new programs or construction, which require a vote of the electors, and support or expansion of existing governmental facilities or functions, which do not.
Earlier cases dealing with water systems are instructive. In Woodward v. City of Orangeville, 13 Idaho 652, 660, 92 P. 840, 842 (1907), the Court held that the City of Grangeville was not authorized, without a vote of the electors, to purchase an existing water system from the estate of a deceased city resident. However, in the Hickey case, we held that the City of Nampa was authorized, without voter approval, to repair and improve an existing water system. Likewise, a decision by the City of Moscow to drill a new well to support a voter-approved plan to improve an existing water system and build a water storage tank to provide a “more adequate water supply” did not necessitate a vote of the people. The well was not approved by the voters but the Court deemed it necessary to the project nevertheless. Durand v. Cline, 63 Idaho 304, 312-13, 119 P.2d 891, 894-95 (1941).
Aside from its errant reliance on Dunbar for the urgency element, the Frazier Court merely followed the long-standing dichotomy between new construction, on the one hand, and maintenance of an existing facility, on the other. The expensive new parking garage in Frazier was clearly not exempt under the proviso clause and, therefore, a vote was required under article VIII, section 3. The *409 Dunbar urgency language was not actually necessary for the Court’s holding.
Turning to the case at hand, there is no question but that the Challis water project involved ordinary expenditures. The City of Challis had exercised its power under Idaho Code section 50-323 to construct and operate a domestic water system; had acted pursuant to Idaho Code section 50-309 to maintain a fire department and “to provide water for fire purposes” in the city; and decided to operate and maintain an airport, as authorized by Idaho Code section 50-321. The question is whether the three elements of the water project presented here are within the necessary prong of the proviso clause.
In this regard, the district court made the following pertinent findings of fact:
8. As the owner and operator of the [water] System, the City is charged with the duty of maintaining safe and reliable services for the City and its residents, and to do so in a manner that does not jeopardize the City’s drinking water supply and provides sufficient fire flow. In furtherance of that responsibility in December 2011, the City retained the services of Riedesel Engineering, a professional consulting civil engineering firm duly authorized and licensed to practice in Idaho (the “Engineer”), to conduct a study of the System for the purpose of determining the adequacy of the System for present and future needs with respect to standards established by the local fire authority, the State of Idaho through its Department of Environmental Quality (“DEQ”) and the United States Environmental Protection Agency (“EPA”). The Engineer performed a study entitled “City of Challis Water Facility Plan” along with the supplemental information and emergency protocol for the City’s existing water system (DEQ No. 11-13-19) (the “Study”).
9. The most recent water system facility plan and resulting improvement project performed for the City had dated from 1981 and is approximately 30 years old. The residential services and meters installed with the 1980s capital project are aged and need to be replaced.
10. However, the majority of the system, the Old Town distribution system, dates back to the 1930s. These pipes have reached their useful life and are now dilapidated and in need of replacement resulting in multiple breaches in the city, including several this year. Should a breach occur in a main section of this distribution line, entire sections of the City could be without water.
11. Although no enforcement action has been brought against the City, the City’s system is not in compliance with State law.
a. The City is not able to provide adequate fire flows due to the use of existing four (4) inch old and dead end water mains, and small diameter un-looped lines. IDAPA 58.01.08.542.06 addresses the size of water mains. The section provides that where fire hydrants are provided, they shall not be connected to water mains smaller than six (6) inches in diameter, and fire hydrants shall not be installed unless fire flow volumes are available.
b. As testified to by the engineer and the public works director, all of the 130 fire hydrants are in need of replacement because they contain dilapidated componentry that cannot be serviced. To date only 25-30 have been replaced.
c. However, the hydrants are connected to four (4) inch lines. Pursuant to IDA-PA 58.01.08.50 the adequacy of the water system fire flow capacity is determined by the local fire authority. The Challis system does not meet the minimum standard established by the local fire authority, Chief Gunderson, who expressed concerns that the Challis’ system limits the District’s ability to fight a fire. The concerns include
i. The use of 4 inch lines in violation of IDAPA 58.01.08.542.06.
ii. Improper spacing of. fire hydrants in violation of IFC Appendix B, Table C105.1.
iii. The existing distribution system cannot meet peak hour demand with the design fire criteria in violation of IDAPA 58.01.08.552.01.b.i.
*410 iv. Many of the fire hydrants are dysfunctional.
v. The public works director testified that the fire hydrants provide suitable flow for only approximately 45 seconds.
vi. In short, the fire chief, engineer, and public works director expressed concerns that the system cannot effectively fight a fire.
12.In order to repair this preexisting and obligatory utility, achieve compliance with state law minimum safety regulations, and obtain the required amount of fire flow to protect the health and safety of the citizenry, the Study (which as a planning document contains over $8 million dollars of recommended upgrades) was [pared] down to meet the immediate needs of the System totaling $2,129,066 in repairs and replacement plus additional estimated funding requirements for contingencies, design engineering, bidding, testing, and other costs total $3,036,960. These include:
a. Construction of distribution system improvements to tie the Old Town system eliminating the 4-inch pipes and the fire hydrants that tie to them, install new and properly spaced fire hydrants, and tie-in dead end lines. Add pressure reducing stations and isolation valves to create (4) pressure zones which eliminates service areas that are over-pressurized.
b. Install a telemetry system to improve supervisory control and data acquisition to protect the water system.
c. Replace metering with new automated read (AMR) equipment taking the first steps to recover the estimated 4% lost water identified by Idaho Rural Water, which will provide accuracy of water usage, but more importantly the billing, which is necessary precondition for DEQ approval, funding and to comply with a water audit.
d. Installation of a transmission pipeline to provide minimum supply of water necessary for firefighting service to the Challis Airport as determined by the fire authority, Chief Gunderson.
13. Donald Acheson, the city engineer believes that a piecemeal approach to the replacement of the aging componentry does not mitigate the danger to the public safety as a system is only as strong as its weakest link, and it is not foreseeable as to exactly where the breach or fire 'will occur.
14. Based on the Study and other available information, the City’s Mayor and Council have determined that the proposed improvements are necessary to meet the present and immediate needs of the City. The improvements are essential to ensure that the System remains functional and adequate to meet the requirements of Idaho law and provide for minimum required fire flow protection both in old town and to the airport, and to provide security for this valuable resource. Additionally, the replacement of pipes, hydrants, meters, and telemetry are part of a regular, ordinary, and necessary maintenance of a preexisting and obligatory utility.
These findings certainly appear to be supported by the record.
The Caucus does not identify and attack specific factual findings made by the district court but, rather, devotes one and one-third pages of its opening brief to arguing that no evidence supported the Court’s “determination that the Project was necessary for fire protection, health or welfare.” The Caucus claims that expenses for repair or maintenance of a water system do not qualify as necessary within the meaning of the proviso clause unless “recent casualty or accident ... impaired the System,” citing Hickey. The Caucus contends that since the City “is presently providing its users with clean drinking water,” and because what the City “proposes is a permanent solution to a future risk,” the proviso clause does not allow the proposed expenditures. The Caucus claims that since there is no evidence that the City is not presently able to fight actual fires, there is no necessity to address the problem with the aging 4-inch pipes, dilapidated componentry, and inadequate existing system at the airport.
Essentially, the Caucus takes the position that since there has not been an actual *411 breakdown or disaster, the water system cannot be repaired, improved, expanded, or modernized, without a vote of the people. This attitude appears to be at odds with the forward-looking, optimistic, and expansive views exhibited by Idaho’s constitutional framers.
It is clear from the convention proceedings that the framers of the Constitution were hopeful about Idaho’s future. They wanted and expected towns to grow and prosper. They knew that towns would grow into cities, and that cities would expand to accommodate growing populations and would need to continually modernize their existing facilities. They wanted governing bodies to exercise caution in implementing new programs and constructing new facilities and, therefore, required a vote of electors for those purposes. But, they knew that, once approved, the new infrastructure would need to be maintained, expanded for growing communities, and modernized to keep it up to date. For those purposes they adopted the proviso clause. It was clear from the debate that they did not want to hamstring cities by requiring that they hold a vote every time some existing facility needed to be expanded or modernized. That was just an inherent part of voter approval of a new project or a new facility, just as digging a new well was an inherent part of improving the water system in Du-rand.
The City determined that expenditures were necessary to improve the water system by replacing old infrastructure within the city proper, to extend the system to the City airport, and to improve the means for conserving and accounting for water with modern telemetry. None of this entailed establishing a new program but, rather, was to maintain and modernize the existing system and make it available to the City’s airport.
Even though the City had good drinking water and had not suffered catastrophic failure of the distribution system, it was clearly dilapidated and out of date, had many dysfunctional fire hydrants, and was crying out for replacement. The airport was not connected to the main water system and its own water system was inadequate, particularly with respect to fire protection. The new controls were necessary to conserve water, to improve accountability, and to protect the integrity of the system. Just as it would not be appropriate to require that voters approve the modernization of county or city accounting and recordkeeping from pen and pencil to computers, it shouldn’t require a vote to modernize the controls of a city water system from manual to electronic. That is just an inherent part of owning infrastructure. As the Court said in Hickey, “[i]n order for this property to be of any value to the city, it was necessary for it to be kept in repair.” 22 Idaho at 44, 124 P. at 281.
The district court did a good job of analyzing the issues presented and its decision was in keeping with the spirit of the Idaho constitutional drafters. I would affirm.
Justice BURDICK concurs.